**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CVI INVESTMENTS, INC.,

               Plaintiff,

       v.

STEVEN M. MARIANO,

              Defendant.

.

Case No.: 19-cv-02960

**COMPLAINT**

      CVI Investments, Inc. ("CVII"), by its attorneys Ballard Spahr LLP, as and for its Complaint against Defendant Steven M. Mariano ("Mariano") alleges as follows upon personal knowledge with respect to its own acts, and upon facts obtained through an investigation by its attorneys and review of publicly available documents and materials including but not limited to: (a) relevant filings made by Patriot National, Inc. ("Patriot" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) public news reports, governmental agency reports, conference calls, and press releases; (c) public information filed in the stockholder derivative and class actions captioned *Wasik, et al. v. Mariano, et al.*, C.A. 12953-VCL (Del. Ch.) and *McIntire v. Mariano, et al.*, C.A. 0:18-cv-60075-BB (S.D. Fla.) (the "Wasik Actions"); and (d) research analysts' reports concerning Patriot, among other things:

## NATURE OF THE ACTION

      1.      CVII brings this action against Mariano, the former Chairman of the Board of Directors (the "Board"), former Chief Executive Officer ("CEO"), and the controlling majority shareholder of Patriot, for fraud, fraud in the inducement, and tortious interference with contract for making false and misleading statements and omissions of material fact, including but not limited to statements made directly to CVII and in Patriot's filings with the SEC and, to induce

CVII to enter into an investment with Patriot and Mariano for Mariano's personal financial benefit, and for fraudulently inducing CVII into revising the arrangement again with fraudulent SEC filings and through promises that Mariano never intended to fulfill. Additionally, Mariano tortiously interfered with Patriot's obligations to provide CVII with shares of Patriot stock pursuant to a grant of warrants (the "New Warrants") issued as part of the revised transaction by intentionally and without justification failing to hold sufficient unencumbered shares to satisfy Patriots' obligations to CVII under the New Warrants. Indeed, Mariano never intended to deliver sufficient unencumbered shares to Patriot to satisfy the New Warrants and this also fraudulently induced CVII to enter into the agreement.

2.     On December 13, 2015, CVII entered into a securities purchase agreement (the "SPA") with Patriot and Mariano in which CVII purchased shares of restricted, unregistered common stock and warrants to purchase additional shares of common stock at a later date. Mariano received $13.5 million from CVII under the deal terms and delivered a number of his own shares and made commitments to deliver a percentage of the shares due to CVII under the warrants issued by Patriot.

3.     After the transaction was publicly disclosed, Patriot's share price fell. Mariano claimed to be shocked by this and requested that CVII renegotiate the terms. In reliance on his promises of new warrants with enhanced terms that Mariano would personally fulfill, CVII agreed to revise the deal.

4.     On December 23, 2015, CVII entered into a rescission and exchange agreement (the "REA") with Patriot and Mariano in which CVII's purchase of restricted stock from Patriot was rescinded (and Patriot returned the purchase price it had received from CVII) but CVII's

purchase of restricted stock from Mariano was maintained, allowing Mariano to keep the $13.5 million CVII had paid to him in connection with the original investment.

5.      In connection with the REA, based on Mariano's representations, CVII exchanged the warrants it had originally purchased for the New Warrants that still gave CVII the right to purchase additional shares at a later date but with different terms.

6.      Since Mariano was now receiving the full benefit of CVII's investment under the revised deal, Mariano assured CVII and expressly agreed, pursuant to an Amended Stock Back-to-Back Agreement, that he would deliver to Patriot all of the shares that Patriot would owe to CVII upon CVII's exercise of the new warrants.  This promise required Mariano not to encumber or pledge such shares in a manner that could undermine CVII's rights.

7.      At the time of the revised investment, despite promises to CVII regarding the benefits to it of the new warrants and CVII's reliance on those promises in agreeing to the revised deal terms, Mariano did not intend to comply with the obligations under the revised deal and intended to prevent Patriot from fulfilling its obligations to deliver shares to CVII under the new warrants.

8.      Mariano misrepresented to CVII his own and Patriot's intent to comply with the terms of the revised deal in order to allow Mariano to retain the funds he had received from CVII and to prop up the Patriot share price and therefore Mariano's own net worth and ensure the continued operation of Mariano's separate privately held company, Guarantee Insurance Company, Inc. ("Guarantee").

9.      Indeed, Mariano did not intend to perform under the deal terms (and intended to prevent Patriot from performing) before the original transaction closed but did not disclose his intent to CVII to ensure that CVII would wire funds to both Patriot and Mariano.

10.     Mariano also misrepresented to CVII Patriot's financial outlook and omitted that Patriot's financial projections, including projections made in a press release and a filing with the SEC just one month earlier, would not be achieved by the Company.

11.     Actually, all of Patriot's SEC filings, including the financial information contained therein, were materially false and misleading since, as Mariano knew but hid from CVII, Patriot's primary source of revenues and largest customer, accounting for over 60% of its business, Guarantee was falsifying its financial statements submitted to the Florida Office of Insurance Regulation ("FOIR") while filtering millions of dollars to Mariano and his affiliates with no benefit to Guarantee and was doomed to failure, bringing Patriot down with it.

12.     From the moment Patriot sold shares to the public in its initial public offering on January 15, 2015, Mariano presented a false image of Patriot and its business.

13.     Specifically, while touting Patriot's purportedly positive financial performance and outlook for the future, Mariano intentionally withheld information regarding the abysmal financial state of Patriot's key customer, Guarantee, which accounted for 60% to 70% of Patriot's income and revenue and was critical to Patriot's continued existence.  Mariano failed to disclose that Guarantee was on the brink of failure and was dependent on repeated loans and capital contributions from Mariano to avoid insolvency.  Mariano, in turn, used his position as controlling shareholder of Patriot to extract money for himself that he used to support a lavish lifestyle, and to prop up Guarantee which he also controlled.  Meanwhile, Patriot fully recognized revenue based on its contracts with Guarantee even though it had not received payments and had no reasonable expectation of ever being paid in full.  In fact, Patriot's receivable from Guarantee grew from $2,137,140 as of December 13, 2013 to $46,757,000 as of December 31, 2016.  At no point did Patriot make any allowance for the doubtful recovery of this receivable.  This significantly

overstated Patriot's revenues and assets, painting a false and misleading financial picture of the Company.

14.     Guarantee ultimately was forced into receivership by the FOIR on November 13, 2017 with the receivable owed to Patriot unpaid. Of course, the receivable will never be paid because those funds have been siphoned by Mariano and his cohorts and are now gone. Patriot has now filed for bankruptcy protection and its stock is worthless.

15.     Mariano assured CVII through the SPA and REA that CVII could rely on Patriot's SEC filings in completing the transaction with Patriot and Mariano. CVII did rely on the SEC filings and was harmed as a direct and proximate result of the materially false and misleading statements peppered throughout those SEC documents.

16.     As a result of Mariano's misrepresentations and omissions, CVII was induced to invest $13.5 million in its transaction with Patriot and Mariano.

17.     Following the stock price decline, when CVII sought to exercise its warrants less than four months later, as a result of Mariano's fraudulent act and tortuous interference with CVII's contract with Patriot, Patriot breached its obligations to CVII for the new warrants. Specifically, under the Amended Back to Back Agreement, Mariano agreed to provide Patriot with 100% of any shares required to be delivered to CVII pursuant to the new warrants ("Amended Back to Back"). Mariano was required to reserve sufficient unencumbered shares to satisfy his obligations to Patriot and he knew that those shares would be used to satisfy Patriot's obligations to CVII. Mariano however intentionally failed to unencumber the shares needed to satisfy the new warrants which created a substantial incentive for Patriot to breach the REA and Patriot breached the agreement by refusing to honor CVII's warrants. Mariano's intentional interference with CVII's contractual rights was without justification and caused REA to breach the agreement with CVII.

5

At Mariano's behest, Patriot offered numerous excuses for refusing to honor the warrants and deliver shares owed to CVII.  First, it claimed it was refusing to deliver shares due to an investigation being conducted by the Financial Industry Regulatory Authority ("FINRA").  This was untrue and Patriot did not reassert thereafter that any FINRA investigation was the basis for its refusal to honor the warrants.  Moreover, there was no basis for Patriot to breach the New Warrants based on the FINRA letter because the letter was simply a routine letter that is sent by FINRA with respect to many transactions and it gave Patriot no grounds to contend that either the SPA or REA had been breached.

18.     Next, Patriot claimed it was not performing under the agreements because CVII had breached the parties' contracts by borrowing or short selling Patriot shares; the Court has now ruled that those excuses were also unjustified as CVII did not breach any contractual obligation owed to Patriot or Mariano.  *See CVI Investments, Inc. v. Patriot National, Inc.*, Case No. 16-cv-2787, Opinion and Order Granting Summary Judgment for CVII, D.E. 201 (S.D.N.Y. March 28, 2019) (the "Summary Judgment Opinion").  Also, Patriot could not—and did not—breach the New Warrants because it did not want CVII, which it viewed as short-term, speculative investor, owning a significant chunk of its shares, when both the SPA and the REA allowed CVII to engage in short-selling activities.

19.     Mariano, without justification, induced Patriot to take ever more dramatic steps to avoid its obligations to CVII and to filter funds out of Patriot and to Mariano before any judgment could be rendered in CVII's favor, thereby rendering Patriot judgment proof.  These steps included seeking to forestall a final ruling in the action CVII commenced through delays in discovery, requests for fruitless mediations and threats of an imminent bankruptcy filing (which was then delayed by months); suing various other parties involved in the transaction; accusing them of

misconduct; and refinancing its debt in an effort to declare an extraordinary dividend, all of which wasted Company assets and hastened the demise of Patriot.

20.     CVII was denied the benefit of its bargain by Mariano's fraud, fraudulent inducement and tortious interference with the contracts, preventing Patriot from honoring CVII's warrants.  CVII has suffered damages in excess of $20 million as a direct result of Mariano's tortious conduct.

## THE PARTIES

21.     Plaintiff CVII is an investment fund that transacts in, among other things, investments that provide public companies with capital through equity or debt (or both). CVII is organized under the laws of the Cayman Islands and has its principal place of business in the Cayman Islands. For purposes of diversity under 28 U.S.C. § 1332(a), CVII is a citizen of the Cayman Islands, a foreign state.

22.     Defendant Steven M. Mariano is a natural person who, upon information and belief, is a citizen and resident of the state of Florida. At all times relevant to this Complaint, Mariano was the CEO of Patriot, as well as the Chairman of Patriot's Board and its majority controlling stockholder.  For purposes of diversity under 28 U.S.C. § 1332(a), Mariano is a citizen of Florida.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2), because the action is brought by a citizen of a foreign state against a citizen of a state within the United States, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

24.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a), in that it is a judicial district in which a substantial part of the events and omissions giving rise to the claims

occurred, including but not limited to, the preparation and dissemination of false and misleading statements and SEC filings, the negotiations of the relevant transaction documents, the closing of the transactions giving rise to this action, and the transmission of the correspondence dishonoring the warrant exercises.

25.     Additionally, in Section 9(a) of the SPA and Section 8(c) of the REA, Mariano consented to jurisdiction and venue in the United States District Court for the Southern District of New York.  Pursuant to those same provisions, the SPA and the REA are governed by and subject to interpretation under New York law.

## FACTUAL ALLEGATIONS

### A.     Background of Patriot and Its Activities Upon Becoming a Public Company

26.     In 2003, Mariano started a workers' compensation insurance business and acquired Guarantee.

27.     Because Guarantee is a Florida insurance company, it is regulated by the FOIR and is subject to annual capital requirements.  Each year, regulated insurance companies must file financial statements with the FOIR and the National Association of Insurance Commissioners by March 1, reporting their solvency and risk-based capital as of the end of the calendar year just ended.  An insurance company's financial information must satisfy certain criteria of the FOIR, such as certain ratios based on the company's amount of risk-based capital.  An insurer that does not satisfy the criteria may be put under regulatory supervision, which allows for the claw back of receivables and fees from agents of the insurers, the return of unearned premiums, and a prohibition on writing new business. Mariano owned substantially all of the outstanding equity of Guarantee and a majority of Patriot's outstanding equity.

28.     By 2013 Guarantee's business was in trouble.  Guarantee had incurred annual operating losses since 2007.  In 2012 and 2013, Guarantee reported $22.3 million and $16.7 million

in net underwriting losses, respectively.   Similarly, in 2014, Guarantee had $17.43 million in underwriting losses and a total net income loss of $26 million.

29.     Because of Guarantee's losses, Mariano was forced to cover the losses by pumping tens of millions of dollars into Guarantee each year to keep it solvent and in compliance with FOIR's capital requirements.   One of the ways Mariano raised the necessary capital to pump into Guarantee was to have Patriot (and its predecessor entity and affiliates) take on debt, the proceeds of which he would then deliver to Guarantee (as well as use to support his lavish lifestyle).

30.     By the end of 2014, Mariano no longer had the ability to use money borrowed by Patriot to keep Guarantee afloat.   Mariano therefore decided to tap the public markets to cover the continuing and mounting losses at Guarantee.   Following a reorganization and spinning off of Guarantee, on December 16, 2014, Patriot filed a registration statement with the SEC for an initial public offering ("IPO") of its common stock.

31.     On January 14, 2015, Patriot filed a final registration statement for its common stock with the SEC (the "Registration Statement"), which became effective January 15, 2015 and on January 20, 2015, Patriot filed a prospectus for its IPO with the SEC (the "Prospectus").

32.     On January 15, 2015, Patriot went public, offering 7,350,000 shares of its common stock at $14 per share, raising $102.9 million.

33.     Prior to the IPO, Mariano owned 15,352,170 shares, representing 84.9% of Patriot's voting power.   After the IPO, Mariano continued to own the same number of shares, but his control dipped to approximately 60%.

34.     Immediately after the IPO, Patriot entered a new senior secured credit facility with BMO Harris Bank N.A. ("BMO"), comprised of a $40.0 million revolving credit facility and a $40.0 million term loan facility.

35.     Patriot used a portion of the money from the BMO loan and the proceeds from the IPO to repay PennantPark Investment Corporation and UBS for loans from August 2014, releasing Mariano's Patriot shares from their pledges.

36.     Rather than use the remaining funds from the BMO loan and IPO to support Patriot, Mariano used them to further enrich himself, his associates and other Patriot insiders by purchasing private businesses he and they owned.

37.     On February 5, 2015, Patriot purchased 98.8% of the membership interests in DecisionUR, LLC for $2.2 million in cash from Six Points Investment Partners, LLC, a Mariano-owned company operating out of Patriot's offices.  Mariano received all of the proceeds from this sale.

38.     On February 12, 2015, Patriot acquired Vikaran Solutions, LLC ("Vikaran"), a company in which Mariano held a 45% interest, for $8.5 million in cash.  Patriot also agreed to purchase Mehta and Pazol Consulting Services Private Limited for approximately $1.5 million. Mariano received $3.8 million for the Vikaran acquisition and $749,850 from the acquisition of Mehta and Pazol.

39.     Patriot also acquired three companies from Edward Snow, a long-time friend and business associate of Mariano for over $17 million.

40.     In connection with these self-interested acquisitions, Patriot distributed generous M&A bonuses, with Mariano receiving $700,000.

**B.     Mariano's Efforts to Raise Additional Funds by Late 2015**

41.     In connection with the IPO, Mariano entered into a customary lock-up agreement, preventing him from offering, selling, contracting to sell, pledging or otherwise disposing of, directly or indirectly, Patriot common stock during the period ending 180 days after the IPO, or July 17, 2015.

42.     During the lock-up period, Mariano's cash needs grew exponentially.  On March 11, 2015, Mariano purchased a $37 million, 187 foot yacht.  Lacking the necessary liquidity to buy the yacht, Mariano took out a $32.3 million loan from Fifth Third Bank (the "Fifth Third Loan").

43.     Pursuant to the Fifth Third Loan, Mariano pledged, commencing July 31, 2015, $50 million in Patriot common stock to Fifth Third Bank as collateral.  The Fifth Third Loan also required that Guarantee maintain a risk-based capital ratio of at least 200%.

44.     Next, on August 12, 2015, Mariano took out a $12.5 million revolving note.  Under the terms of this note, Mariano was required to maintain at least $10 million worth of liquid assets or marketable securities as collateral against the note.  Any Patriot stock held as collateral, however, was discounted by 35% to 75%.

45.     This was still not enough for Mariano and Guarantee's needs, including Guarantee's annual capital requirements.

46.     Accordingly, in late 2015, at Mariano's urging due to his own personal financial needs and the needs of Guarantee, Mariano caused Patriot to explore options to raise additional money and through which Mariano could sell his own personal stock.

47.     On October 5, 2015, Patriot filed a Form S-1 registration statement with the SEC for a secondary offering of Patriot common stock, which included Mariano's sale of an undisclosed number of shares (the "Secondary Offering").  The market reaction was very negative.  On October 5, 2015, Patriot's stock opened at $16.15 per share, and closed at $14.72 per share.  The next day, the stock closed at $13.61 per share.

48.     On October 15, 2015, Patriot amended the S-1 to disclose that the Secondary Offering would total $80 million, including a $55 million stock sale by Patriot and a $20 million

stock sale by Mariano.  Patriot's stock price continued to fall on the revised disclosures.  Shortly thereafter the public offering was terminated.

**C.**      **The Pipe Transaction with CVII**

49.      Upon information and belief, at Mariano's behest, on or about November 25, 2015, Patriot approved the engagement of J.P. Morgan Securities, Inc. ("JPM") as placement agent for a private placement transaction that would close before year-end.

50.      Patriot's board authorized the Company to offer only primary shares in the private placement, again at Mariano's behest, because, on information and belief, Mariano was advised that a private sale of his own shares, without any involvement of the Company, would not be well received and likely would not generate sufficient interest from investors to satisfy Mariano's and Guarantee's capital needs.

51.      Upon information and belief, at the same time Mariano was planning the private placement, in order to bolster Patriot's flagging share price following the terminated Secondary Offering and to increase the chances that the private placement would be completed on terms favorable to Mariano, Mariano caused the Company to include in its November 9, 2015 press release with its third quarter financial results rosy projections for Patriot's financial performance for full year 2015 and 2016.

52.      At the time of those projections, Patriot's 2015 fiscal year was 80% complete and Mariano knew or was reckless in not knowing that Patriot could not achieve the earnings performance it was projecting for 2015.  Mariano also knew or was reckless in not knowing that Patriot's financial performance for 2016 would not achieve the new projections because Patriot was highly dependent on income from Guarantee and Guarantee was already struggling financially and needed an infusion of cash for its continued survival.  Guarantee would not be able to continue to provide Patriot with revenues in 2016 at the level Patriot needed to meet its new projections.

53.     Even with this artifice, Patriot's private placement did not receive the amount of interest Mariano needed.  The investors interested in the private placement were only willing to contribute $50 million, below the $60 million or more requested by Patriot.

54.     Upon information and belief, Mariano needed $30 million to prop up Guarantee so that it would satisfy its annual capital requirements and appear to be a viable entity and so that Patriot could continue to report income and profits based on its purported business relationship with Guarantee.

55.     Accordingly, while CVII had initially been told that the investment would be divided equally between Patriot and Mariano, shortly before the transaction documents were finalized, CVII was told that the Patriot Board did not like how expensive the financing was and therefore the investment would be divided so that Patriot would sell 40% of the restricted shares and receive 40% of the proceeds, and Mariano would sell 60% of the restricted shares and receive 60% of the proceeds.  This enabled Mariano to obtain the $30 million he needed for himself and Guarantee.

**D.     CVII Participates in the Private Placement Transaction with Patriot and Mariano**

56.     On December 13, 2015, the Patriot Board unanimously resolved to, among other things:  (i) appoint the placement agent [JPM] to pursue the private placement transaction; (ii) approve the SPA; and (iii) approve a stock back-to-back agreement between Patriot and Mariano, providing that Mariano would contribute 60% of any stock Patriot issued pursuant to the warrants to be issued in the transaction, commensurate with Mariano's percentage of the proceeds from the deal.

57.     That same day, Patriot, Mariano, CVII, and two additional investors executed the SPA which provided for the sale of restricted, unregistered stock and two series of warrants, the

Series A and Series B warrants (the "Original Series A Warrant," "Original Series B Warrant," and together the "Original Warrants") for a total purchase price of $50 million.  CVII's share of the investment was 45% (or $22.5 million), with one of the other investors also contributing 45% ($22.5 million) and the third investor paying 10% ($5 million).

58.     In accordance with the agreement, at closing, proceeds were paid 40% to Patriot and 60% to Mariano.  Thus, Patriot received $20 million in the transaction, and Mariano received $30 million, $13.5 million of which was paid by CVII.

59.     Because only the Company could register shares, Patriot alone sold the Original Warrants to CVII and Patriot alone was obligated under the Original Warrants to deliver shares to CVII and the other investors upon their exercise.  But, in conformity with the split of proceeds, Mariano entered into a stock back-to-back agreement with Patriot, in which Mariano agreed to sell to Patriot (for the exercise price paid by the investors under the Original Warrants) 60% of the shares Patriot would ultimately deliver to the investors under the Original Warrants.

60.     The Original Warrants were designed to provide CVII with potential additional returns if Patriot's stock price increased and protection if the price declined.

61.     Specifically, the Original Series A Warrant granted CVII the right to purchase 937,500 Patriot shares (subject to adjustment under certain conditions) at the lesser of a fixed price of $15 per share (subject to adjustment under certain conditions) or a discount to the Market Price (as that term is defined) of Patriot stock as of the exercise date(s).  Thus, if Patriot's stock price increased above $15 per share, CVII could exercise the Original Series A Warrant and sell the shares, potentially at a significant profit.

62.     The Original Series B Warrant was intended to provide price protection to CVII in case the Patriot stock price fell after CVII's investment and before CVII could sell the restricted

shares it had purchased.  Accordingly, the Original Series B Warrant was designed to allow CVII to purchase additional shares at a nominal exercise price of $0.01 per share if the market price of Patriot stock fell below $12.00 per share (the effective price CVII had paid for the restricted shares delivered to it under the transaction) during a specific adjustment window in the future beginning six days after the deal and ending ten days after Patriot's filing with the SEC of its annual Form 10-K.  This would result in CVII receiving additional shares to make CVII whole for its $13.5 million investment.

63.     Patriot reported the terms of the Initial Transaction in a press release and filed the SPA and other transaction documents with the SEC on December 14, 2015.

64.     Upon the announcement that Patriot and Mariano had sold stock and warrants in a private placement, Patriot's stock price sharply declined.

65.     This should have come as no surprise to Mariano, as the Company had already seen a negative price reaction when Patriot and Mariano attempted to sell shares in the failed secondary offering.

66.     Mariano was initially unfazed by the negative market reaction and even sent an email to other Patriot Board members on December 14, 2015, touting his successful "stewardship" of Patriot with a "second capital raise in 11 months," and asking them to "[p]lease think about sending some stock options [and] [r]estricted stock [his] way . . . Not a bad strike price right now."

67.     When Mariano could not reverse the negative market reaction, he became disillusioned with the deal he had struck and looked for anyone else to blame.

68.     Mariano blamed JPM, the placement agent for the transaction, and later refused to pay its fee.

69.     Mariano also looked for ways to blame CVII and the other investors in the private placement and avoid the obligations under the transaction.

70.     Indeed, Mariano immediately planned to avoid any obligations to CVII under the existing transaction or any revised transaction.  For instance, during the time leading up to the execution of the REA, Mariano exchanged emails with individuals on the Patriot Board regarding when and under what circumstances CVII would be able to exercise its rights under the downside protection feature of the series B warrants.  During this time, Mariano and the Patriot Board explored ways to delay CVII's ability to exercise the warrants, as well as scenarios in which CVII would never exercise its warrants--underscoring Mariano's  knowledge that the Company did not intended to, and that Mariano would not cause the Company to, honor the terms of the REA, and more specifically, the New Warrants, particularly if the Company's stock price did not rebound from its severe decline following announcement of the Initial Transaction.

71.     Mariano concealed his plan from CVII during several discussions he had with CVII's Investment Manager, Martin Kobinger, regarding the proposed terms of the revised transaction in which Mariano never revealed to CVII that he was planning scenarios that would prevent CVII from being able to exercise its warrants.

72.     Even though Mariano knew he did not want to proceed with the transaction almost immediately after it was signed, he wanted to receive the $30 million payment due to him under the deal.  The closing of the transaction was scheduled to occur on December 16, 2015, and Mariano would receive his money from the transaction that day.

73.     So, rather than disclose to CVII that he and Patriot would not fulfill Patriot's side of the deal, Mariano waited until December 17, 2015 -- the day after the closing when CVII and

the other investors made payment to Patriot and Mariano – to advise CVII that he wanted to renegotiate the deal terms.

74.     Mariano's silence ensured that he received the funds he (and Guarantee) desperately needed, and denied CVII the opportunity to walk away from the deal before the closing which it would have done had it learned of Mariano's intent not to comply with the transaction's terms.

**E.     CVII Agrees to Mariano's Request to Revise the Transaction**

75.     On December 17, 2015, at Mariano's direction, JPM contacted CVII and relayed Mariano's request to revise the deal, citing concerns Patriot had purportedly heard from institutional shareholders about dilution of their stock that would result from the original transaction. Despite being under no legal obligation to do so, CVII agreed to discuss revisions to the deal to address Patriot's stated concerns and attempt to mollify its existing shareholders.

76.     CVII and Mariano (on Patriot's behalf) commenced negotiation of revised deal terms.  During the entire time that Mariano was negotiating the proposed revised deal with CVII, on information and belief, Mariano developed a plan to avoid the future obligations under the original deal or any revised deal the parties might reach.  Mariano had no intention of performing under any deal with CVII.  Instead, he never disclosed to CVII that he had no intention of performing in order to induce CVII to enter into the REA.  Mariano therefore was able to lull it into inaction so it would not immediately pursue its rights to enforce the deal or rescind its payment.

77.     Despite Mariano's planning for litigation against CVII, on December 22, 2015, Mariano caused the Patriot Board to approve amendments to the transaction (including the REA

and amended stock back-to-back agreement) by unanimous written consent and without a board meeting.

78.     On December 23, 2015, Patriot, Mariano, and CVII executed the REA.  Consistent with CVII's negotiations with Mariano, the REA required CVII to return the shares it had purchased from Patriot and Patriot returned to CVII the proceeds it had received in the initial deal.

79.     CVII and the other investors retained the shares they had purchased from Mariano, and Mariano kept the $30 million purchase price he had received from the investors (including the $13.5 million he had received from CVII).  Upon information and belief, after receiving the $30 million dollars discussed above, Mariano immediately pumped $17 million into Guarantee allowing Guarantee to facially meet its capital requirements deadline of December 31, 2015.  Guarantee, however, owed Patriot millions of dollars for past due accounts payable, which as of December 31, 2015, totaled $27 million, and on information and belief was not properly accounted for by either Guarantee or Patriot.

80.     In addition to returning the shares it had purchased from Patriot, again as CVII had agreed with Mariano during their negotiations, CVII exchanged the Original Warrants it had previously received for New Warrants with the revised terms Mariano had offered to induce CVII to accept a restructured deal.  The New Warrants again provided CVII the right to receive additional stock, and were integral to the completion of the revised transaction.

81.     Specifically, the New Series A Warrant granted CVII the right to purchase 1,462,500 Patriot shares (subject to adjustment under certain conditions) at the lesser of a fixed price of $10 per share (subject to adjustment under certain conditions) or a discount to the Market Price (as that term is defined) of Patriot stock as of the exercise date(s).

82.     The New Series B Warrant was still designed to provide price protection to CVII by issuing to CVII additional shares at a nominal exercise price of $0.01 per share if the market price of Patriot stock remained below $12.00 per share during the new adjustment window which began, at Mariano's request, on February 1, 2016 and ran until ten days after Patriot's Form 10-K filing.  The number of shares issuable to CVII under the New Series B Warrant was now designed to result in CVII to be made whole on $13.5 million investment.

83.     Like the Original Warrants, the New Warrants were issued to CVII by Patriot, but because Mariano was now receiving 100% of the proceeds from the transaction, Mariano concurrently agreed, through an amended stock back-to-back agreement, that he would sell to Patriot the same number of shares from his own holdings (for the exercise price to be paid by CVII and the other investors) that Patriot ultimately would deliver under the New Warrants.  In this way, Patriot could tell the market that no additional shares would be issued after any warrant exercise, thereby purportedly eliminating the potential dilution to other Patriot stockholders.

84.     Accordingly, the New Warrants, if properly honored, made Patriot a pass-through agent, taking Mariano's shares and delivering them to CVII.

**F.      Mariano Never Intended to Allow Patriot to Honor the New Warrants**

85.     Despite CVII's accommodation to Mariano in agreeing to revise the deal terms, Mariano did not intend to honor the obligations under the revised transaction or the amended stock back-to-back agreement and in fact planned to prevent Patriot from honoring its obligations under the deal.  Instead, Mariano intended to receive the proceeds from the transaction but not be compelled to give up the shares required under the warrants, even if that was required by the exercise of the New Warrants issued to CVII under the deal and the terms of the amended stock back-to-back agreement.

86.     Rather than be truthful with CVII, Mariano intended to obtain through fraud what he could not achieve with contract negotiations – he induced CVII to pay $12.00 per share for his restricted stock and would deny CVII the benefit of the warrants that were an integral part of both the original deal and the revised transaction.

87.     As discussed above, unbeknownst to CVII, even before the closing of the original transaction (when CVII wired its funds) and throughout the parties' negotiations for the revised deal, Mariano was secretly planning to take actions to avoid the Company's and Mariano's obligations under any deal with CVII.  Mariano was consulting litigation counsel and had numerous communications about potential actions to take against CVII between the execution of the SPA and the REA.  Upon information and belief, Mariano also conferred with one of Patriot's largest institutional investors in this same time period seeking evidence of any potential misconduct by CVII and the other investors in the deal.

88.     Rather than disclose any alleged concerns about CVII's conduct or attempt to cancel the original transaction before the closing, which would have resulted in Mariano not receiving the $13.5 million paid by CVII, Mariano waited until the deal closed (and the funds were received) to alert CVII that he had any desire to alter the deal.

89.     Then, after the closing, Mariano personally communicated with CVII to renegotiate the deal, knowing that he and Patriot would reject any effort by CVII to exercise its rights under the New Warrants and instead would assert claims against CVII when Mariano's and Patriot's obligations came due.

90.     Mariano did not mention any purported basis for avoiding the transaction to CVII at any time before the REA was executed, instead proceeding as though he fully intended to

comply with the commitments of the new transaction and cause Patriot to comply with its obligations under the parties' deal to induce CVII to agree to the revised transaction.

91.     Mariano did this not only to keep the proceeds from the original deal, but also so CVII would agree to revise the transaction, allowing Mariano and Patriot to announce to the market a new deal that he hoped would result in Patriot's stock price rising.  Since Mariano owned a significant percentage of Patriot's outstanding stock, his own personal wealth was tied directly to Patriot's stock price.

92.     This was critically important to Mariano, too, because Mariano had significant personal loans for which his Patriot stock holdings served as collateral.  Therefore, the reduction in Patriot's share price could result in his lenders demanding additional collateral or even claiming default under the loans.

93.     Mariano withheld information about his personal loans (and his encumbrance of his Patriot shares) from CVII and willfully and fraudulently misrepresented that he had sufficient unencumbered stock to satisfy his obligations to deliver shares owed to CVII under the warrants when he did not.

94.     In particular, in Section 4.1 of the amended stock back-to-back agreement between Mariano and Patriot, Mariano represented and warranted that he "at all times shall (a) own sufficient shares of Common Stock to satisfy his obligations [to deliver 100% of the shares owed under the New Warrants] . . . , (b) not sell or transfer (contingently or otherwise) any shares of Common Stock that will leave him with ownership of less than such number of shares of Common Stock, and (c) not place or permit to exist any liens, charges or encumbrances" on his shares.

95.     Yet, at the time he made this representation, Mariano had already pledged and encumbered 7,932,080 shares—the majority of his holdings in Patriot stock — as collateral for the

two personal loans he had outstanding with Fifth Third Bank and UBS before the revised deal was even signed. In fact, the number of Mariano's shares that were pledged to his two personal loans eventually rose to 11,855,480 shares due to the increased collateral demands resulting from the reduction in Patriot's share price.

96.     Accordingly, Mariano's remaining unencumbered shares were not enough to fulfill his obligation to deliver shares due to the investors under the New Series A Warrant if fully exercised, much less under both the New Series A and New Series B Warrants, particularly if Patriot's stock price did not rebound significantly before February 1, 2016.

97.     Mariano nonetheless advised CVII that he would be responsible for delivering the shares underlying the New Warrants and executed the REA and amended stock back-to-back agreement without disclosing the liens on his shares to mislead CVII (and Patriot's other stockholders) into believing Patriot would perform under the warrants and that its delivery of shares under the warrants would not result in any dilution to Patriot's existing stockholders and to induce CVII to enter into the original and revised transactions.

98.     Mariano used promises regarding the terms and benefits of the New Warrants as a carrot to induce CVII to agree to revise the deal, knowing that neither Mariano nor Patriot (acting at Mariano's bidding) would ever deliver on those promises.

99.     All the while, Mariano hid his objective of not performing under the revised transaction from CVII and the market.

100.    After the parties agreed to the revised transaction and executed the REA, Patriot filed a Form 8-K on December 23, 2015 reporting the revised transaction and the amended stock back-to-back agreement.

101.     Upon information and belief, Mariano reviewed and approved the filing of the Form 8-K even though he knew that he (and Patriot at his direction) would never honor the terms of the New Warrants or the amended stock back-to-back agreement and that Mariano was already in violation of his representations under the amended stock back-to-back agreement.

G.     **Mariano Misrepresented Patriot's Financial Outlook**

102.     In addition to inducing CVII to enter into the revised transaction with false promises of performance knowing they were hollow, upon information and belief, at the time of the initial transaction in mid-December 2015 and certainly by the time of the revised transaction on December 23, 2015, Mariano knew, but failed to disclose to CVII, that Patriot was going to miss the earnings projections it had reported to the market for 2015 and would need to reduce the financial guidance it had provided for 2016.

103.     As discussed above, after Patriot announced its planned secondary stock offering, its share price fell.  Even after Patriot announced that it was withdrawing the offering in late October 2015, its share price did not recover.  Knowing that he would attempt yet another stock sale before year end, Mariano attempted to prop up Patriot's stock price.  Accordingly, in Patriot's November 9, 2015 press release reporting on its third quarter 2015 financial results (which was attached and incorporated into an SEC Form 8-K filed by Patriot that same day), Patriot provided rosy financial projections for both fiscal years 2015 and 2016.

104.     On information and belief, at the time Patriot published its November 9, 2015 press release (almost half way through the fourth quarter), Mariano, as CEO and Chairman of Patriot and owner of Guarantee, knew that Patriot would miss its projections for fiscal year 2015 and knew or was reckless in not knowing that Patriot would need to revise its 2016 guidance downward.

105.    The SPA was executed on December 13, 2015, the closing of the initial transaction occurred on December 16, 2015, and the REA was executed on December 23, 2015.

106.    On information and belief, by December 13, 2016, and certainly by December 23, 2016, Mariano, as CEO and Chairman of Patriot and owner of Guarantee, knew that Patriot would miss its projections for fiscal year 2015 and knew or was reckless in not knowing that Patriot would need to revise its 2016 guidance downward.

107.    In fact, Patriot did fail to meet its own 2015 financial projections which resulted in a significant deterioration in its stock price.

108.    In particular, on February 24, 2016, Patriot announced its 2015 fiscal year end financial results.  As Mariano knew they would, Patriot's results fell below its own projections in almost every category.

109.    Patriot also reduced its financial outlook for fiscal year 2016 in the same February 24, 2016 press release.

110.    The fact that Patriot would not meet its own 2015 projections and would revise its 2016 projections downward were material facts that Mariano had a duty to disclose to CVII in connection with Mariano and Patriot's sale of shares in the Company to CVII.

111.    Yet, Mariano failed to disclose to CVII that Patriot would not meet its earnings projections and induced CVII to rely on Patriot's SEC filings, including its November 9, 2015, Form 8-K containing those projections.

112.    CVII would not have entered into the original transaction or agreed to revise the transaction had Mariano disclosed the truth that Patriot would not meet its earnings guidance.

113.    CVII suffered damage as a direct and proximate result of Mariano's false and misleading statements and omissions.

**H.**     **Patriot Was Doomed to Fail Based on the Dire Financial Straits of Guarantee**

114.    Even after the disappointing earnings announcement in February 2016, Mariano's lies and deceit about Patriot's financial condition was unknown, but the truth has more recently come to light.

115.    After receiving $30 million through the transaction with CVII in December 2015, in November 2016, Mariano attempted to orchestrate yet another $30 million payment to himself, despite the substantial harm this effort caused Patriot.

116.    In particular, in November 2016, Patriot refinanced its existing debt into a larger credit facility at more than double the interest rate so it could use the additional funds to pay an extraordinary $2.50 per share dividend, which would have resulted in Mariano receiving $36 million based on his ownership of Patriot shares (most of which he should have already delivered to CVII and the other investors pursuant to their exercises of the New Warrants).

117.    One Patriot director resigned, purportedly for health reasons, weeks before the loan refinancing occurred, and another short-term Patriot director resigned immediately before the refinancing deal, specifically citing disagreements with Mariano over the management of the Company as the reason for his resignation.

118.    The proposed dividend was not paid because in December 2016, the Delaware Chancery Court issued an injunction blocking it based on a breach of fiduciary duty derivative action filed there.

119.    The reason Mariano apparently had a recurring need for a $30 million annual payout remained unclear until two months later.

120.    Then, in late February 2017, Mariano caused Patriot to skirt the Delaware Chancery Court injunction by paying Guarantee $30 million directly, purportedly to extend an "exclusivity" arrangement with Patriot for ten years into the future.

121. Announcement of that payment sent Patriot's share price tumbling down yet again as Patriot shareholders realized that Guarantee, Patriot's largest customer and the source of over 60% of its revenues, clearly needed an infusion of cash and was in dire financial straits.

122. And, upon information and belief, Guarantee began violating the new contract within weeks of receiving Patriot's $30 million payment, causing yet another Patriot Board member to resign in May 2017.   Indeed, Guarantee's auditor reported in August 2017 that Guarantee had breached the terms of its contract with Patriot, including provisions requiring Guarantee to "extend the renewal expiration date of all service agreements with Patriot [] by ten years from the expiration date" and by distributing $8.5 million to GIG, its parent company (owned by Mariano), despite covenants that "prohibited the issuance of dividends or distributions, or any further advances to any shareholder."

123. The full extent of Guarantee's financial troubles remained unknown until August 18, 2017, when Guarantee signed a consent order with the FOIR, requiring it and its affiliates "to be placed in administrative supervision for the purpose of protecting the assets of [Guarantee] and protecting the interests of its insureds during the implementation of a proposed corrective action plan" which "could result in both significant restructuring of [Guarantee's] business as well as the infusion of capital."   The consent order also prohibited Guarantee from writing any new policies for 120 days.

124. The FOIR required further auditing of Guarantee's financials in conjunction with the consent order and on November 13, 2017, the FOIR put Guarantee into state receivership.  That same day, the FOIR sent a letter to Florida's Department of Financial Services (the "DFS") "petitioning for an order appointing the [DFS] as receiver and directing it to rehabilitate or liquidate the business of [Guarantee]."

26

125.     In the letter to DFS, the FOIR stated that "[Guarantee] has insufficient assets to pay all outstanding obligations and is insolvent" and that its "insolvency renders its further transaction of insurance hazardous to its policyholders, subscribers, claimants, creditors, and the citizens of the state of Florida."

126.     The FOIR further found that Guarantee "knowingly filed a false financial statement with the [FOIR]."  Even more troubling, the FOIR reported that Guarantee had "systematically transferred funds, totaling $15,743,000 to Mr. Steven Mariano, the ultimate owner of [Guarantee] during the calendar year 2016 and through June 2017.  These transfers were made with no documented business purpose and no discernible benefit to [Guarantee]."  The FOIR went on to say that Mariano "benefitted individually from these transactions by receiving cash from [Guarantee], [but] this indebtedness diverted funds that otherwise could be used to increase the surplus of [Guarantee] and otherwise be available for the payment of policyholders."  The FOIR also reported that it had "identified other transactions involving parties with known association to Mr. Mariano that have been harmful to [Guarantee]."

127.     Since Guarantee was Patriot's largest customer, still accounting for more than 60% of its revenues, the revelations about Guarantee essentially ensured Patriot's demise.

128.     Just days later, on November 22, 2017, Patriot filed a Form 8-K with the SEC stating:  "The Company's largest customer, Guarantee [], which has historically accounted for approximately 60-70 percent of the Company's business, consented to be placed into receivership on November 13, 2017.  The Company has met with the [FOIR] on various occasions, including most recently on November 20, 2017, seeking to obtain both payment for past services rendered to [Guarantee] and an agreement that would allow the Company to provide and receive payment for future services while [Guarantee] is in receivership.  However, based on the most recent

meeting with the [F]OIR and other authorities now engaged in respect of [Guarantee], the Company does not believe these efforts will be successful. Accordingly, a major portion of the Company's revenue and cash flow going forward will cease. Based on the Company's deteriorating financial condition, and in compliance with the Worker Adjustment and Retraining Notification Act, the Company has notified approximately 250 employees, representing approximately one-third of its workforce, of the immediate termination of their employment. . . ."

129.    On November 28, 2017, Patriot reported that it and its subsidiaries intended to file voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code.

130.    Patriot ultimately did file for bankruptcy protection in January 2018.

## I.    Mariano Misrepresented Patriot's Financials in Its SEC Filings

131.    Upon information and belief, Mariano knew that Guarantee was falsely reporting its financials.  Mariano also knew that he was looting money from Guarantee and diverting it to himself and people and entities associated with him.  In December 2015, Mariano knew or was reckless in not knowing that Guarantee was doomed to fail and that Guarantee's insolvency would bring Patriot down with it.

132.    Mariano nonetheless caused Patriot to file with the SEC financial statements that painted a rosy picture of the Company's financial health and prosperity, without disclosing that the customer that was the source of the vast majority of Patriot's revenues was insolvent and being used to illegally filter funds to Mariano and his associates.

133.    Upon information and belief, Mariano knew that Patriot was doomed to fail and intended to drain as much money from it as he could for his own personal benefit while it lasted, including by defrauding CVII into investing in the December 2015 transaction.

134.    Mariano failed to disclose to CVII information about Guarantee's fraudulent financials and the resulting peril to Patriot's continued existence which he had a duty to disclose when selling stock to CVII.

135.    Mariano in fact induced CVII to rely on Patriot's SEC-filed financial statement which he knew were materially false and misleading because, among other things, they omitted material facts about the fraudulent and unsustainable revenues from Guarantee.

136.    In particular, in Sections 3(a)(xiv) of the SPA, entitled "Financial Statements," Mariano caused the Company to represent to CVII that:

> The financial statements of the Company and its Subsidiaries included in the SEC
> Documents, together with the related notes, present fairly in all material respects
> the combined financial position of the Company and the Subsidiaries as of the dates
> indicated and the combined results of operations, cash flows and changes in
> stockholders' equity of the Company and the Subsidiaries for the periods specified
> and have been prepared in compliance with the requirements of the 1933 Act and
> 1934 Act and in conformity with U.S. generally accepted accounting principles
> applied on a consistent basis during the periods involved, and, in the case of
> unaudited, interim financial statements, subject to normal year-end audit
> adjustments and the exclusion of certain footnotes; all pro forma financial
> statements or data included in the SEC Documents comply with the applicable
> requirements of the 1933 Act and the 1934 Act in all material respects, and the
> assumptions used in the preparation of such pro forma financial statements and data
> are reasonable, the pro forma adjustments used therein are appropriate to give effect
> to the transactions or circumstances described therein and the pro forma
> adjustments have been properly applied to the historical amounts in the compilation
> of those statements and data; the other financial and statistical data contained in the
> SEC Documents are accurately and fairly presented in all material respects and
> prepared on a basis consistent with the financial statements and books and records
> of the Company; there are no financial statements (historical or pro forma) that are
> required to be included in the SEC Documents that are not included as required; the
> Company and the Subsidiaries do not have any material liabilities or obligations,
> direct or contingent (including any off-balance sheet obligations), not described in
> the SEC Documents; and all disclosures contained in the SEC Documents regarding
> "non-GAAP financial measures" (as such term is defined by the rules and
> regulations of the Commission) comply with Regulation G of the 1934 Act and
> Item 10 of Regulation S-K under the 1933 Act, to the extent applicable.

137.    Likewise, Section 3(a)(xv) of the SPA, entitled "No Material Adverse Change," stated:

Except as described in the SEC Documents, subsequent to the respective dates as of which information is given in the SEC Documents, in each case excluding any amendments or supplements to the foregoing made after the execution of this Agreement, there has not been (i) any material adverse change, or any development involving a prospective material adverse change, in the business, properties, management, financial condition or results of operations of the Company and the Subsidiaries taken as a whole . . .

138.    Section 3(a)(xxiii) of the SPA, entitled "Accounting Controls," represented:

The Company and each of the Subsidiaries maintain a system of internal accounting controls sufficient to provide reasonable assurance that (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and to maintain accountability for assets; (iii) access to assets is permitted only in accordance with management's general or specific authorization; (iv) the recorded accountability for assets is compared with existing assets at reasonable intervals and appropriate action is taken with respect to any differences; and (v) the interactive data in eXtensible Business Reporting Language included in the SEC Documents fairly presents the information called for in all material respects and has been prepared in accordance with the SEC's rules and guidelines applicable thereto.

139.    Section 3(a)(xxiv) of the SPA, entitled "Disclosure Controls and Procedures," provided a Sarbanes-Oxley Act ("SOX") representation that the Company had established and maintained sufficient "disclosure controls and procedures" under SOX and that the procedures were designed to ensure that material information relating to the Company is made known to the CEO and CFO and ensuring that the auditors and audit committee of the Patriot Board was advised of "all significant deficiencies, if any, in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial data" and of "all fraud, if any, whether or not material, that involves management or other employees who have a role in the Company's internal controls."  Section 3(a)(xxviii) of the SPA further represented that "[t]here is and has been no failure on the part of the Company and any of the Company's directors or officers, in their capacities as such, to comply with any provision of [SOX] . . ."

140.    In Section 3(a)(xxix) of the SPA, Mariano caused Patriot to represent to CVII:  "As of their respective dates, the SEC Documents [filed by the Company] complied in all material respects with the requirements of the 1934 Act or the 1933 Act, as the case may be, and the rules and regulations of the SEC promulgated thereunder applicable to the SEC Documents, and none of the SEC Documents, at the time they were filed with the SEC, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading."   Patriot further represented in Section 3(a)(xxxi) of the SPA that "[a]ll transactions that have occurred between or among the Company or any of its Subsidiaries, on the one hand, and any of their respective officers or directors, or any affiliate or affiliates of any such officer or director, on the other hand, prior to the date hereof have been disclosed in the SEC Documents . . ."  And, finally in Section 3(a)(xxxv), Patriot claimed that it "had discussions with its accountants about its financial statements as of and for the two years ended December 31, 2014 and as of and for the quarters ended March 31, 2014 and 2015, June 30, 2014 and 2015 and September 31, 2014 and 2015, in each case as filed with the SEC and, based on those discussions, the Company has no reason to believe that it will need to restate any such financial statements or any part thereof."

141.    Unbeknownst to CVII, all of Patriot's relevant SEC filings were false and misleading and each of Patriot's representations in the SPA leading CVII to rely on Patriot's SEC filings were likewise false and misleading.

142.    Patriot filed a number of financial reports and statements with the SEC before its transaction with CVII in December 2015, including (1) its January 14, 2105, Registration Statement signed by Mariano; (2) its 2014 Form 10-K, dated March 31, 2015, signed (or authorized) by Mariano with a SOX certification submitted by Mariano; (3) its May 6, 2015 first quarter 2015 earnings press release, filed with the SEC that same day as an exhibit to a Form 8-K;

(4) its May 14, 2015 Form 10-Q, with its first quarter 2015 results with a SOX certification filed by Mariano; (5) its August 14, 2015, Form 10-Q, with its second quarter 2015 results, with a SOX certification filed by Mariano; (6) its October 15, 2015 Secondary Offering S-1, signed (or authorized) by Mariano; and (7) its November 12, 2015 Form 10-Q, with its third quarter results, with a SOX certification filed by Mariano.

143.    Each of these SEC filings purported to state Patriot's revenues, goodwill, accounts receivables, allowance for doubtful debt, and other financial metrics.  They also each claimed that the financial statements presented were "prepared in conformity with" GAAP and that, in accordance with the Financial Accounting Standards Board ("FASB") accounting standards, Patriot "assessed potential impairment on [its] goodwill and intangible asset balances, including client lists, on an annual basis, or more frequently if there is an indication that the asset may be impaired."  The SEC documents also claimed that Patriot was "not currently subject to any material interest rate risk or credit risk" and that "[m]anagement believes that the receivable balances from [Guarantee] do not represent significant credit risk based on cash flow forecasts, balance sheet analysis and past collection experience" and did not identify any allowance for doubtful accounts in connection with the Guarantee receivable.

144.    All of these SEC filings were false and purposefully misleading because they omitted and/or misrepresented:  (1) Guarantee's ability to operate as a going concern, including meeting its regulatory capital requirement; (2) Guarantee's ability to repay sizable accounts payable owed to Patriot; (3) Patriot's adherence to GAAP, including properly accounting for doubtful accounts and intangible assets; (4) risks to Patriot caused by Guarantee's precarious financial position; (5) the credit risk Patriot was under as a result of the sizable and ever increasing account receivable due from Guarantee; (6) Patriot's failure to record impairments of its goodwill

and other intangible assets; and (7) Patriot's adherence to its Policy Regarding Transactions with Related Persons and otherwise ensuring proper corporate governance.

145.    They also were false and materially misleading by purposefully and/or recklessly failing to disclose material information about the primary purpose for Patriot going public in the first instance – *i.e.*, allowing Mariano to tap public funds to cover Guarantee's annual losses and meet FOIR capital requirements and to obtain additional funds to divert to himself.

146.    As discussed above, Guarantee sustained over $43 million in losses between 2007 and 2013, preceding Patriot's IPO.  Due to the annual losses, Mariano was forced to pump a total of $36 million into Guarantee so it could meet its year-end FOIR capital requirements.  Mariano knew or was reckless in not knowing as of November 2015 that Guarantee would be unable to pay the substantial ($22.1 million) account payable it owed to Patriot.  In fact, the amounts due from Guarantee to Patriot grew each quarter and Guarantee was only able to pay off any portion of the balance it owed Patriot when Mariano injected it with capital at year-end.  Had Mariano not tapped the public markets in Patriot's IPO, Guarantee would not have been able to pay its debts to Patriot at all.  And, there were no assurances (or even any reasonable basis to believe) that Mariano would be able to legally leverage his control over Patriot to obtain additional funds for Guarantee in the future.

147.    As was ultimately revealed by Guarantee's receivership and insolvency and Patriot's subsequent bankruptcy, Guarantee's precarious financial condition, which was manifest and known by Mariano, did in fact pose a significant "credit risk" to Patriot.  In fact, as Patriot's November 22, 2017 Form 8-K report disclosed, Guarantee's fall into receivership resulted in the non-payment of its account payable owed to Patriot and caused "a major portion of [Patriot's] revenue and cash flow going forward" to cease, forcing Patriot into bankruptcy itself.

148.    The SEC filings also failed to disclose that Mariano had used Patriot stock to meet the FOIR capital requirements for Guarantee.  This essentially leveraged up Patriot, creating an undisclosed risk of Patriot failing as a result of its own stock price.  A company's stock price should reflect its financial health and profitability; it should not be a factor in and of itself that impacts a company's ability to operate as a going concern.

149.    The SEC documents were also false and misleading because the financial statements were not in conformity with GAAP.  As Guarantee needed support from Patriot to remain in business, the collectability of the account receivable from Guarantee was not reasonably probable or assured and should have been reserved against.  Failure to record a reserve or allowance for doubtful accounts with respect to the Guarantee account receivable made Patriot's financial statements materially false and misleading.

150.    Because collectability from Guarantee was not reasonably probable or assured, it was improper for Patriot to recognize revenue from Guarantee until payment was actually received.  Patriot nonetheless consistently recognized unpaid revenue owed to it by Guarantee. Accordingly, Patriot's revenue figures were consistently overstated and materially false and misleading.

151.    Patriot's financial statements were also materially misstated with regard to goodwill.  Specifically, GAAP requires that when an acquisition occurs, any excess of the purchase price over the fair value of the assets acquired and liabilities assumed be reported as goodwill. GAAP also requires, and Patriot acknowledged, that goodwill be tested for impairment at least annually or more frequently if any changes in circumstances or events indicate the asset may be impaired.

152.    Approximately 43% of Patriot's goodwill listed in its November 12, 2015 Form 10-Q was tied to acquisitions of entities that derived a substantial portion of their revenues from Guarantee.  Thus, the majority of the goodwill attributed to the acquisition of those businesses relied on Guarantee's revenue stream.  As of November 2015, Mariano knew or was reckless in not knowing of Guarantee's deteriorating state and its ultimate inability to provide future revenues to any Patriot-related business.  Accordingly, Mariano was aware, or was recklessly uninformed, of circumstances requiring that Patriot test for impairment of goodwill.  Had Patriot done so, it would not have reported the goodwill of those businesses at approximately $50 million.  Patriot's failure to conduct an impairment test for its goodwill rendered the SEC documents' claim that Patriot adhered to GAAP's goodwill impairment requirement false and/or misleading.

153.    Mariano knew that Patriot's SEC documents were false and misleading and intended to deceive CVII and induce it to rely on those statements in deciding to engage in the transactions with Patriot in December 2015.

154.    CVII did, in fact, rely on Patriot's materially false and misleading SEC documents in deciding to engage in the transactions with Patriot and Mariano.  Had CVII known the truth about the SEC documents and both Patriot and Guarantee's precarious financial conditions, it would not have engaged in the transactions.

155.    The revelation about Patriot's and Guarantee's true financial condition caused Patriot's stock price to plummet and the true state of the Company and Guarantee ultimately resulted in Patriot's bankruptcy.

156.    CVII suffered damages as a direct and proximate result of its reliance on the false and misleading statements because it entered into the contract when it would not have done so, but for the fraud, did not receive the warrant shares and ultimately could not recover on its judgment

against Patriot for breach of the warrants due to Patriot's bankruptcy and other actions taken by Patriot to funnel assets to Mariano.

**J.      Mariano Caused Patriot to Refuse to Honor CVII's Warrant Exercises**

157.    As discussed above, on February 24, 2016, Patriot announced its 2015 fiscal year end financial results.  As Mariano knew they would by November 2015, Patriot's results fell below its own projections in almost every category.

158.    Patriot also reduced its financial outlook for fiscal year 2016 in the same February 24, 2016 press release.

159.    Not surprisingly, Patriot's stock price fell precipitously on that announcement.  On February 25, 2016, Patriot's stock price fell from the prior day close of $6.11 per share to $4.54 per share with trading volume exceeding 2 million shares.

160.    Patriot's stock price continued to decline over the next several days, closing at $3.65 per share on March 2, 2016.

161.    Because the shares CVII had purchased in the transaction were initially unregistered, CVII could not immediately sell those shares.

162.    The registration for the shares became effective in mid-February 2016, and tradeable shares were delivered to CVII on or about February 12, 2016.  Because of the number of shares CVII had purchased in the transaction and the typical daily trading volume of Patriot stock in or around that time, CVII could not sell all of its Patriot shares immediately.

163.    CVII therefore sold only a small percentage of its shares each day and was continuing to sell the shares it had purchased in the transaction after Patriot's February 2016 earnings release.  CVII therefore received far less in its market sales of the stock it had purchased in the transaction than it had paid for the shares.

164.    CVII would have been compensated for this loss in value had Patriot and Mariano honored the New Series B Warrant, but they did not.

165.    Patriot's February 2016 earnings announcement was released in the midst of the measurement period under the New Series B Warrant for determining the number of additional shares owed to CVII.

166.    Upon information and belief, in an effort to bolster Patriot's stock price during the measurement period and prevent CVII from being owed even more shares under the New Series B Warrant, in early March 2016, Mariano caused Patriot to issue a press release suggesting that the Company was considering "strategic alternatives" that might lead to a sale of the Company at a premium to its then-trading share price and also instituted a share repurchase program.

167.    Mariano's intent to use the announcement to increase Patriot's market price, rather than for any legitimate reason, is evidenced by the fact that he had asked a consultant to review precedent announcements by a company regarding undergoing a strategic review and was advised that "[a] company's stock went up, on average, 4.6% the day after the announcement[.]"

168.    The plan worked and Patriot's stock price began to rise upon the news of the strategic alternatives and the implementation of the share repurchase program.

169.    Upon information and belief, the stock price did not rise quickly enough for Mariano, so he took additional steps to prop up Patriot's share price, including causing GIG to purchase Patriot stock concurrently with Patriot's own aggressive share repurchasing that Mariano himself directed, some days constituting over 20% of the total trading volume in Patriot stock.

170.    Even with these efforts to buoy the stock price during the adjustment window for the New Series B Warrant, the market price of Patriot stock immediately following the February

24, 2016 earnings announcement resulted in CVII being entitled to receive 2,200,124 additional shares of Patriot stock at an exercise price of $0.01 per share under the New Series B Warrant.

171.    Patriot confirmed that calculation in its Form 10-K filing with the SEC on March 21, 2016, stating that "[b]ased on the lowest 10-day volume-weighted average stock price during the period commencing on February 1, 2016 through March 17, 2016 of $4.51, we estimate that 4,895,985 shares of our common stock would be issuable upon exercise of the New Series B Warrants."   Since CVII's investment constituted 45% of the total investment in the revised transaction, this equated to 2,200,124 additional shares owed to CVII under the New Series B Warrant.

172.    On April 5, 2016, CVII delivered an exercise notice under the New Series B Warrant for 250,000 shares.

173.    Mariano— in furtherance of the scheme he had previously hatched before the transaction was revised— caused Patriot to refuse to deliver the shares owed to CVII.  Mariano also refused to deliver shares owed to Patriot under the amended stock back-to-back agreement, thereby putting Patriot in the position of having to dilute its other shareholders if it were to honor CVII's warrant exercise by issuing new shares of Patriot stock.  The same day CVII delivered its exercise notice, counsel for Patriot sent a letter to CVII stating that Patriot would not honor the exercise notice at that time.

174.    Patriot and Mariano had no legitimate basis for the refusal to honor the New Series B Warrant and deliver the shares.  In fact, Patriot should have been indifferent to delivering shares to CVII under the New Series B Warrant since Mariano was obligated under the amended stock back-to-back agreement to provide all of those shares to the Company from his own personal holdings.

175.    In his letter refusing to honor CVII's exercise notice, Patriot's counsel attributed Patriot's decision to a purported "investigation" into the transaction by FINRA.  Patriot had never previously advised CVII of any such purported investigation.  Moreover, CVII had not received any communication from FINRA regarding any purported investigation.  And, since its initial letter refusing to honor the warrant exercise, Patriot never again cited any purported FINRA investigation as justification for its refusal to honor the New Warrants.  Instead, the purported FINRA investigation was merely a pretext for Mariano to fulfill his preconceived scheme of never honoring the revised transaction from the outset.

176.    On April 14, 2016, CVII filed a breach of contract action asserting breach of the New Series B Warrant against Patriot in the United States District Court for the Southern District of New York, captioned *CVI Investments, Inc. v. Patriot National, Inc.*, Case No. 1:16-cv-2787 (S.D.N.Y.).  Upon information and belief, at Mariano's behest, Patriot still refused to comply with its obligations under the New Series B Warrant and instead defended against CVII's action at a significant cost to Patriot.

177.    In addition, on July 1, 2016, the New Series A Warrant became exercisable.

178.    On August 1, 2016, Patriot announced that it was considering an offer to purchase 100% of the shares of the Company's stock at a substantial premium to the current market price.

179.    Patriot's stock price increased in response to that announcement.

180.    This temporary increase in the stock price made exercising the New Series A Warrant economically attractive.

181.    Accordingly, on August 1, 2016, CVII delivered to Patriot an exercise notice under the New Series A Warrant for 100,000 shares.

182.   As with the New Series B Warrant, Mariano—in furtherance of the scheme he had previously hatched before the transaction was revised—prevented Patriot from delivering the shares it owed to CVII.   Mariano also again refused to deliver shares owed to Patriot under the amended stock back-to-back agreement, thereby putting Patriot in the position of having to dilute its other shareholders if it were to honor CVII's warrant exercise by issuing new shares of Patriot stock.  Patriot and Mariano again had no legitimate basis for their refusal to honor the warrant.   In fact, Patriot should have been indifferent to delivering shares owed to CVII under the New Series A Warrant since Mariano was obligated under the amended stock back-to-back agreement to provide all of those shares to the Company from his own personal holdings.

183.   CVII subsequently amended its complaint to add a second count of breach of contract for Patriot's breach of the New Series A Warrant.  Mariano and Patriot still refused to comply with the obligations under the New Series A Warrant and instead continued to defend against CVII's action at a significant cost to Patriot.

184.   Rather than reiterating the claim that they were justified in not honoring CVII's warrant exercises based on a FINRA investigation, in the litigation context, Patriot and Mariano pivoted to a different argument – that they were justified in breaching the warrants due to CVII's alleged prior breach by borrowing and short selling Patriot stock when it was purportedly prohibited from doing so under the parties' contracts.

185.   This Court has since rejected that argument and ruled that CVII did not breach the parties' contracts.  *See* Summary Judgment Opinion.  Thus, neither Mariano nor Patriot had any valid justification for failing to comply with their contractual obligations to deliver shares to CVII. Instead, the breach claims asserted by Mariano and Patriot were simply another pretense for fulfilling Mariano's plan and scheme, hatched before the REA was even signed, to avoid and refuse

to comply with his (and cause Patriot to refuse to comply with its) obligations under the parties' agreements.

186.    Mariano did not stop there in fulfilling his plan to thwart CVII's rights under the warrants for his own personal benefit–in addition to causing Patriot to defend against CVII's claims with unwarranted charges of breach (and block any discovery as to Patriot's true motivation and knowledge about the propriety of CVII's conduct that would undermine the pretext for refusing to issue the warrant shares), Mariano caused Patriot to take further actions to render the Company judgment-proof, harming Patriot and its other shareholders, all so Patriot could evade a judgment in CVII's favor and while fraudulently transferring assets out of CVII's reach and into Mariano's pockets.

187.    In addition to bringing suit against other parties involved in the transaction and blaming everyone but himself, Mariano caused Patriot to restructure its line of credit, declare an extraordinary $2.50 per share dividend and then shuttle $30 million to Guarantee to skirt an injunction on the dividend issued by the Delaware Chancery Court.  All of these actions ensured that Patriot would be insolvent by the time it would be forced to pay a judgment to CVII for its breach of the warrants.

188.    CVII satisfied its end of the bargain: it paid for the New Warrants and demanded delivery of the shares owed to it under the New Warrants.  In violation of contractual commitments, the Company — under the direct control of Mariano and at his behest— unjustifiably refused to deliver the shares when they came due and has continued to do so ever since.

189.    As a result of Mariano's wrongful conduct, CVII suffered damage by not receiving the shares it was entitled to obtain under the New Warrants and not being able to collect on the judgment it ultimately obtained against Patriot for its breach of the New Warrants.

**K.**     **Mariano's Actions in Causing Patriot to Dishonor the New Warrants Were Motivated by Self-Interest**

190.     Upon information and belief, Mariano, the controlling shareholder, CEO and Chairman of the Board of Patriot, exerted dominion and control over Patriot and the Patriot Board to cause Patriot not to honor CVII's New Warrants and to cause Patriot not to enforce the terms of the amended stock back-to-back agreement against him.

191.     Despite CVII's accommodation in agreeing to restructure multiple aspects of the original transaction shortly after its closing and in furtherance of his own personal interest, Mariano caused Patriot to refuse to issue shares when CVII submitted its exercise notices under the New Warrants.

192.     Upon information and belief, Mariano also failed and refused to deliver shares to Patriot under the amended stock back-to-back agreement.

193.     But for Mariano's failure to make his shares available to Patriot as required under the amended stock back-to-back agreement, Patriot would have had no reason to breach the New Warrants.  The purpose of the amended stock back-to-back agreement was to make performance under the New Warrants costless for Patriot:  the Company was to act as a pass-through, taking exercise payments from the investors and passing them on to Mariano and getting the shares from Mariano and passing them on to the investors.

194.     By failing and refusing to deliver his shares to Patriot, Mariano put Patriot alone on the hook for the New Warrants, essentially requiring the Company to issue new shares causing the very dilution the revised transaction and amended stock back-to-back agreement was designed to prevent.

195.     Mariano thus gave Patriot an incentive it otherwise never would have had to refuse to perform under the New Warrants.

196.    Furthermore, upon information and belief, as Chairman of Patriot's Board and CEO of the Company, Mariano himself voted in favor of refusing to honor the New Series B Warrant in April 2015.

197.    Upon information and belief, Mariano also compelled other members of the Patriot Board to follow his lead in refusing to honor the New Warrants since as majority shareholder of the Company, Mariano controlled the make-up of Patriot's Board.  Indeed, over the course of Patriot's short life as a public company, no less than six members of Patriot's Board were either forced out by Mariano or resigned due to disagreements with him.

198.    Mariano has a proven track record of using his leverage over the Patriot Board to force corporate actions with no ostensible purpose other than to benefit Mariano personally.

199.    For instance, Patriot engaged in the calamitous refinancing transaction (more than doubling the interest rate Patriot owed on its credit facilities) in connection with a $30 million extraordinary dividend payment to Mariano that was blocked by an injunction issued by the Delaware Chancery Court based on a breach of fiduciary duty. Then, in late February 2017, Mariano caused Patriot to skirt the Delaware Chancery Court injunction by paying Guarantee $30 million directly, purportedly to extend an "exclusivity" arrangement with Patriot for ten years into the future.

200.    Mariano therefore wrongfully and tortiously interfered with CVII's contracts with Patriot (the New Warrants) for his own personal, financial benefit and was not acting in any way for the benefit of Patriot.

201.    As with his other improper and self-serving actions, upon information and belief, Mariano demanded that Patriot refuse to honor CVII's exercises of the New Warrants for his own personal financial benefit so that he could retain shares he had committed to delivering to CVII

and the other investors in the private placement transaction to use as collateral for his own personal loans and so that Mariano could continue to exert total control and dominion over Patriot as majority shareholder.

202.    Mariano's intentional and unjustified actions in causing Patriot to dishonor the New Warrants and repudiate the contracts he caused it to sign and that he induced CVII to execute (the New Warrants) caused CVII to lose the benefit of its bargain by not receiving the shares it was owed under the New Warrants.

**FIRST CLAIM FOR RELIEF**
**FRAUDULENT INDUCEMENT**

203.    CVII repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if they were fully set forth herein.

204.    As set forth in detail herein, Mariano made knowing misrepresentations of presently existing material fact intending to deceive CVII and to induce CVII into entering the initial transaction and the revised transaction, specifically the SPA and REA.

205.    Mariano misrepresented his (and Patriot's) presently existing willingness and ability to fulfill the terms of the REA and the New Warrants and intention to honor the New Warrants, as well as Mariano's ability and intention to honor the amended stock back-to-back agreement with Patriot, under which Mariano was required to sell to Patriot one hundred (100) percent of the shares that were deliverable to CVII under the New Warrants.

206.    Mariano also misrepresented that he owned sufficient unencumbered shares to deliver to Patriot upon CVII's exercise of the New Warrants and failed to disclose that Mariano had pledged millions of Patriot shares as collateral under credit agreements that he entered into personally prior to the transaction.

207.    Mariano also misrepresented his willingness and ability to freely transfer the required shares under the amended stock back-to-back agreement, and thereby misrepresented Patriot's ability and willingness to fulfill the terms of the New Warrants.

208.    Mariano made false and misleading statements in his negotiations with CVII and in ensuring CVII that he would comply with the terms of the revised transaction and that he had sufficient unencumbered Patriot stock to deliver to CVII all the Patriot shares CVII was entitled to receive under the New Warrants while concurrently planning to dishonor and cause Patriot to dishonor the New Warrants when CVII sought to exercise them.

209.    Thus, the terms of the New Warrants—which unambiguously provided CVII the right to purchase Patriot shares—constituted a fraud *ab initio*.  Mariano approved the issuance of the New Warrants to CVII and indeed enticed CVII to revise the terms of the parties' original transaction with promises of performance under the New Warrants, knowing that he and the Company would never honor those commitments.

210.    The New Warrants were, and are, an integral part of the transaction entered into by CVII and were knowingly represented as such by Mariano, both in executing the transaction documents and in publicly disclosing the transaction in Form 8-K filings with the SEC.

211.    Mariano reviewed and approved the revised transaction, including the New Warrants, despite knowing that the transaction documents contained false statements and that Mariano did not intend to abide by the terms of the revised transaction or allow Patriot to abide by the terms of the revised transaction, and the New Warrants in particular.

212.    Such scheme was intended to and did (i) deceive CVII as alleged herein and (ii) cause CVII to purchase Patriot securities when it otherwise would not have.

213.     Mariano knew the statements he made to CVII were material and were false and misleading.

214.     Mariano intended to deceive CVII with false and misleading statements regarding his and Patriot's willingness and ability to abide by the terms of the REA and amended stock back-to-back agreement.

215.     CVII reasonably relied on Mariano's knowing misrepresentations and omissions of material fact in entering into the SPA and the REA and in foregoing efforts to rescind the deal immediately when the initial transaction was reported and Patriot's stock price declined, before the transaction closed and CVII wired funds to Patriot and Mariano.

216.     CVII has suffered damages as a direct and proximate result of Mariano's fraudulent inducement in an amount to be determined at trial but in any event exceeding $20 million.

## SECOND CLAIM FOR RELIEF
### COMMON LAW FRAUD

217.     CVII repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if they were fully set forth herein.

218.     In connection with the December 2015 transactions with CVII, Mariano carried out a plan, scheme, and course of conduct, which was intended to, and did: (a) deceive CVII regarding Patriot's business, operations, management, finances and the value of its stock; (b) enable Mariano to enrich himself at the expense of CVII by causing self-interested transactions and obtaining personal benefits, while in possession of material adverse nonpublic information about Patriot; and (c) caused CVII to purchase Patriot securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Mariano took the actions set forth herein. Accordingly, Mariano is liable to CVII for fraud.

219.    Mariano engaged in a fraud by making untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading which operated as a fraud and deceit upon CVII in an effort to receive artificially high prices for the securities CVII purchased in the transaction.

220.    Mariano engaged and participated in a course of conduct to conceal adverse material information about the business, operations, finances and future prospects of Patriot as specified herein.

221.    Mariano engaged in fraud, while in possession of material adverse information and engaged in acts, practices and a course of conduct as alleged herein in an effort to assure CVII of Patriot's value and performance and continued substantial growth, including making of, or participating in the making of, untrue statements of material facts and omitting to state material facts necessary to make the statements made about Patriot and its business operations, finances and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, practices and a course of business which operated as a fraud and deceit upon CVII.

222.    Mariano made false and misleading statements and omissions regarding Patriot's current financial state and its outlook in its SEC filings and encouraged CVII to rely on Patriot's SEC filings to deceive CVII as alleged herein and cause CVII to purchase Patriot securities when it otherwise would not have.

223.    Mariano made false and misleading statements in Patriot's November 9, 2015 press release regarding Patriot's financial outlook for 2015 and 2016 and filed that document with the SEC.

224.    Mariano's scheme was intended to and did (i) deceive CVII as alleged herein and (ii) cause CVII to purchase Patriot securities when it otherwise would not have.

225.    Pursuant to the above plan, scheme, and course of conduct, Mariano participated directly or indirectly in the preparation or issuance of statements and documents described above, including statements made to CVII and SEC filings that were designed to influence CVII's purchase of Patriot securities. Such statements and documents were materially false and misleading in that they failed to disclose material information and misrepresented the truth about Mariano's and Patriot's intentions with respect to the revised transaction and Patriot's true financial situation.

226.    By virtue of his positions at Patriot and his interrelations and connections with Guarantee and other entities with business dealings with Patriot, Mariano had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive CVII.  Alternatively, Mariano acted with reckless disregard for the truth in that he failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to him.  Said acts and omissions were committed willfully or with reckless disregard for the truth.  In addition, Mariano knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

227.    Mariano was personally motivated to make false statements and omit material information necessary to the make the statements made not misleading so that he could keep  the $30 million ($13.5 million of which was paid by CVII) he received for the parties' transaction and not deliver his Patriot shares pursuant to the transactions.

228.    Mariano is liable for the wrongs complained of herein.  Because of his position of control and authority, Mariano was able to and did, directly or indirectly, control the content of the statements made by Patriot.  Mariano knowingly made false statements in, and in connection with the issuance of, the New Warrants.  The misstatements were directed at CVII for the purpose of enticing CVII to enter into the initial transaction and the revised transaction.  CVII reasonably relied on the misstatements.  Had CVII known of the misstatements and about Patriot's true financial state and that Patriot and Mariano would not honor their obligations under the New Warrants and the amended stock back-to-back agreement, it would not have entered into the original transaction or the revised transaction.

229.    CVII suffered damages as a direct and proximate cause of the false and misleading statements and omissions and fraudulent schemes alleged herein.  In particular, on information and belief, Patriot was compelled to dishonor CVII's New Warrants because of Patriot's tenuous financial position that was concealed by the false and misleading statements in the SEC filings. Patriot's refusal to honor CVII's exercise of the New Warrants was also the culmination of Mariano's intent, before the REA was signed, to dispute CVII's entitlement to the benefits of the revised transaction and to litigate against CVII when it sought to enforce the parties' deal.  Further, the value of the Patriot securities CVII purchased in the transaction and the revised transaction declined sharply upon disclosure of Patriot's true financial status and outlook and Patriot's refusal to honor the New Warrants, causing injury to CVII.

230.    By reason of the conduct alleged herein, Mariano knowingly or recklessly, directly or indirectly, defrauded CVII.

231.    As a direct and proximate result of Mariano's wrongful conduct, CVII suffered damages.

## THIRD CLAIM FOR RELIEF
## TORTIOUS INTERFERENCE WITH CONTRACT

232.    CVII repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if they were fully set forth herein.

233.    The New Warrants constitute valid and enforceable contracts.

234.    At all times relevant to this complaint, Mariano had knowledge of the New Warrants.  Mariano entered into the amended stock back-to-back agreement with Patriot, under which Mariano was required to sell to Patriot one hundred (100) percent of the shares that were deliverable to CVII under the New Warrants.

235.    Mariano intentionally and through wrongful and tortious conduct procured a breach of the New Warrants by Patriot by, among other things, insisting that Patriot not honor the New Warrants and by not delivering shares to Patriot as required under the amended stock back-to-back agreement, which had the effect of preventing Patriot from delivering an equivalent number of shares to CVII pursuant to the New Warrants.

236.    Upon information and belief, Mariano intentionally and through wrongful and tortious conduct prevented Patriot from enforcing the terms of the amended stock back-to-back agreement against him.

237.    Mariano's intentional and tortious conduct was carried out for his own personal financial interest and benefit, and not in the interests of Patriot or its other shareholders.

238.    As a direct result of Mariano's intentional and tortious conduct, Patriot breached the New Warrants by failing and refusing to deliver the shares due and owing to CVII pursuant to the New Warrants.

239.    But for Mariano's intentional and tortious conduct, Patriot would have had no reason to breach the New Warrants (and would not have done so).

240.    As a result of Mariano's intentional and tortious conduct causing and resulting in Patriot's breaches of the New Warrants, CVII has suffered damages.

241.    By reason of the foregoing, Mariano is liable to CVII for direct and consequential damages in an amount to be determined at trial.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff CVII respectfully requests that the Court enter judgment in its favor as follows:

A.    An award of monetary damages against Mariano, including direct and consequential damages in an amount to be determined at trial, together with pre-judgment and post-judgment interest thereon.

B.    An award for CVII's costs and expenses incurred in prosecuting this action and in enforcing and/or collecting on the New Warrants, including, without limitation, reasonable attorneys' fees, costs and disbursements.

C.    An award of punitive damages for Mariano's wanton and outrageous conduct.

D.    For such other and further relief as the Court may deem just, proper, and in the interest of justice.

Dated:  April 3, 2019

**BALLARD SPAHR LLP**

By: _/s/  Marjorie J. Peerce_
Marjorie J. Peerce
1675 Broadway, 19th Floor
New York, NY 10019
Main Phone 212.223.0200
Direct Dial 646.346.8039
Fax 212.223.1942
peercem@ballardspahr.com
*Attorneys for Plaintiff CVI Investments, Inc.*