UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CVI INVESTMENTS, INC.,

                Plaintiff,

      v.

STEVEN M. MARIANO,

                Defendant.

Case No. 19-cv-2960 (GBD)

**<u>PLAINTIFF CVI INVESTMENTS, INC'S OPPOSITION TO DEFENDANT
STEVEN M. MARIANO'S MOTION TO DISMISS THE COMPLAINT</u>**

**BALLARD SPAHR LLP**
1675 Broadway, 19th Floor
New York, NY 10019
Main Phone 212.223.0200
Direct Dial 646.346.8039
Fax 212.223.1942

*Attorneys for Plaintiff
CVI Investments, Inc.*

Dated: June 27, 2019

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................ ii

PRELIMINARY STATEMENT ..........................................................................1

ARGUMENT .....................................................................................................2

I.     The Complaint States a Claim for Tortious Interference .......................2

       A.      Mariano Is A Stranger To The Warrants .................................3

       B.      Mariano Cannot Rely on the Economic Interest Doctrine .......4

       C.      Mariano Cannot Rely on His Status As An Officer and Director Of
               Patriot .....................................................................................6

II.    The Complaint States Claims for Fraud and Fraudulent Inducement .................7

       A.      CVII's Fraud Claims Are Not Duplicative .............................10

       B.      The Merger and Non-Reliance Clauses Do Not Bar CVII's Fraud
               Claims ....................................................................................12

       C.      CVII Has Pled Fraud With Sufficient Particularity ...............18

       D.      CVII Adequately Alleges Misrepresentations Based on the Back-to-
               Back Agreements ....................................................................19

       E.      The Complaint Adequately Alleges Fraud By Omission .......21

       F.      The Complaint Alleges More Than Mere Puffery .................23

CONCLUSION .................................................................................................24

# TABLE OF AUTHORITIES

**Cases**                                                                                                       **Page(s)**

*ATSI Commc'ns v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007).................................................................................16

*Barnum v. Millbrook Care Ltd. P'ship*,
   850 F. Supp. 1227 (S.D.N.Y. 1994)..................................................................13

*Basis Yield Alpha Fund (Master) v. Goldman Sachs Grp., Inc.*,
   115 A.D.3d 128 (1st Dep't 2014) .....................................................................16

*Bausch & Lomb Inc. v. Mimetogen Parm., Inc.*,
   No. 14-cv-6640 (FPG), 2016 WL 2622013 (W.D.N.Y. May 5, 2016)....................4

*Cohen v. Koenig*,
   25 F.3d 1168 (2d Cir. 1994)..............................................................................24

*Delshah Grp. LLC v. Javeri*,
   No. 09-Civ-6909 (KBF), 2013 WL 2322488 (S.D.N.Y. May 28, 2013)................23

*DIMON Inc. v. Folium, Inc.*,
   48 F. Supp. 2d 359 (S.D.N.Y. 1999)..................................................................17

*E*Trade Fin. Corp. v. MarketXT Holdings Corp.*,
   No. 05-ap-01082, 2006 WL 2864963 (Bankr. S.D.N.Y. Sep. 29, 2006)................17

*Fresno Cty. Emples. Ret. Ass'n v. comScore, Inc.*,
   268 F. Supp. 3d 526 (S.D.N.Y. 2017).................................................................24

*Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc.*,
   309 F. Supp. 3d 100 (S.D.N.Y. 2018).................................................10, 11, 12

*Hudson Bay Master Fund Ltd. v. Patriot Nat'l Inc.*,
   No. 16-cv-2767 (GBD), 2019 WL 1649983 (S.D.N.Y. Mar. 28, 2019)....... *passim*

*Island Two LLC v. Island One, Inc.*,
   No. 13-cv-2121 (LGS), 2013 WL 5380216 (S.D.N.Y. Sept. 26, 2013) ...............3, 4

*Joan Hansen & Co. v. Everlast World's Boxing Headquarters Corp.*,
   744 N.Y.S.2d 384 (1st Dep't 2002) .....................................................................6

*Kelly v. Jefferies Grp., Inc.*,
   No. 17-cv-2432 (ALC), 2018 U.S. Dist. LEXIS 26090 (S.D.N.Y. Feb. 15,
   2018) .................................................................................................................16

*Kralic v. Helmsley*,
   294 A.D.2d 234 (1st Dep't 2002) ........................................................................6

*LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*,
  10 F. Supp. 3d 504 (S.D.N.Y. 2014)......................................................................17

*Machline v. Nat'l Helicopter Corp. of Am.*,
  No. 94-cv-8456 (LBS), 1997 WL 786937 (S.D.N.Y. Dec. 22, 1997).....................4

*Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*,
  244 F.R.D. 204 (S.D.N.Y. 2007).............................................................................21

*Netto v. Rastegar*,
  No. 12-cv-4580 (CM), 2012 WL 4336167 (S.D.N.Y. Sept. 20, 2012).................12

*New Media Holding Co., LLC v. Kagalovsky*,
  985 N.Y.S.2d 216 (1st Dep't 2014)..........................................................................4

*Nivram Corp. v. Harcourt Brace Jovanovich, Inc.*,
  840 F. Supp. 243 (S.D.N.Y. 1993)..........................................................................24

*Optima Media Grp. Ltd. v. Bloomberg L.P.*,
  No. 17-cv-1898 (AJN), 2019 WL 1746107 (S.D.N.Y. Mar. 29, 2019)...............18

*Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.*,
  753 F. Supp. 2d 166 (S.D.N.Y. 2010).....................................................................21

*Premium Mortg. Corp. v. Equifax, Inc.*,
  583 F.3d 103 (2d Cir. 2009)....................................................................................12

*Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers of New Jersey*,
  894 F. Supp. 2d 288 (S.D.N.Y. 2012).......................................................................6

*Sec. Inv'r Prot. Corp. v. BDO Seidman, LLP*,
  222 F.3d 63 (2d Cir. 2000)......................................................................................20

*Senior Health Ins. Co. of Pennsylvania v. Beechwood Re Ltd.*,
  345 F. Supp. 3d 515 (S.D.N.Y. 2018).....................................................................19

*Stratte-McClure v. Morgan Stanley*,
  776 F.3d 94 (2d Cir. 2015)......................................................................................22

*In re Time Warner Inc. Sec. Litig.*,
  9 F.3d 259 (2d Cir. 1993)........................................................................................22

*Torchlight Loan Servs., LLC v. Column Fin., Inc.*,
  11-cv-7426 (RWS), 2012 WL 3065929 (S.D.N.Y. July 25, 2012).......................12

*UBS Sec. LLC v. Highland Capital Mgmt., L.P.*,
  927 N.Y.S.2d 59 (1st Dep't 2011).......................................................................3, 4

*Ultramar Energy, Ltd. v. Chase Manhattan Bank, N.A.*,
    179 A.D.2d 592 (1st Dep't 1992) ............................................................5

*VR Optics, LLC v. Peloton Interactive, Inc.*,
    No. 16-cv-6392 (JPO), 2017 WL 3600427 (S.D.N.Y. Aug. 18, 2017) ...................................4

*Wall v. CSX Transp., Inc.*,
    471 F.3d 410 (2d Cir. 2006)............................................................12

*White Plains Coat & Apron Co., Inc. v. Cintas Corp.*,
    8 N.Y.3d 422 (2007) ............................................................5

*White Plains Coat and Apron Co. v. Cintas Corp.*,
    460 F.3d 281 (2d Cir. 2006)............................................................5

**Other Authorities**

Fed. R. Civ. P. 9(b) ............................................................18, 19

## PRELIMINARY STATEMENT

This case arises from the same ill-fated private investment in public equity ("PIPE") transaction between plaintiff CVI Investments, Inc. ("CVII") and co-investor Hudson Bay Master Fund, Ltd. ("Hudson Bay"), on the one hand, and Patriot National, Inc. ("Patriot") and defendant Steven Mariano ("Mariano"), on the other, that has been the subject of multiple cases before this Court. This Court has already found Patriot liable to CVII for breach of contract, but CVII will never be able to collect on that judgment due to Patriot's bankruptcy. Mariano must now face liability for the torts he perpetrated in connection with the transaction.

CVII's case against Mariano for tortious interference will be familiar to this Court. This is the same claim (supported by the same facts) advanced by Hudson Bay in the prior actions that this Court recently upheld against Mariano's motion for summary judgment. In his Motion to Dismiss (the "Motion" or "Mot."), Mariano nonetheless reiterates the same arguments against CVII's tortious interference claim that this Court soundly rejected in upholding Hudson Bay's claim. Mariano has offered no reason for the Court to reach any different conclusion now than it did before. His effort to obtain dismissal of CVII's tortious interference claim should be rejected out of hand.

CVII's Complaint in this case asserts two additional claims against Mariano that this Court has not addressed previously – claims for fraud and fraudulent inducement. Mariano seeks dismissal of CVII's fraud counts, primarily arguing that this Court's prior rulings against him should apply equally to CVII's claims here. But, Mariano's argument does not withstand scrutiny. CVII's fraud claims here are nothing like Mariano's fraud counterclaims in the prior actions, and this Court's prior rulings do not warrant their dismissal. Mariano asserts a hodgepodge of additional arguments against CVII's fraud claims that rely on mischaracterizations of the

Complaint or misapplications of the law.  Mariano fails to grapple with the Complaint's actual allegations, which detail the specific false and misleading financial data and other material misrepresentations and omissions Mariano made.

In short, none of Mariano's arguments provides any basis to dismiss CVII's claims.  His Motion should be denied in its entirety.  Mariano was the architect of the PIPE transaction, obtained the full benefit of the transaction for himself, and wrongfully prevented CVII from receiving the benefit of the bargain it made with Patriot.  Mariano then diverted Patriot's assets to himself, helping accelerate Patriot's demise and making it judgment proof.  Mariano has effectively forced CVII to look to him for recovery.  Mariano cannot evade responsibility any longer.  CVII's claims should proceed.

## **ARGUMENT**

### I.    **The Complaint States a Claim for Tortious Interference**

CVII's Complaint asserts one count against Mariano for tortious interference with contract for his intentional and unjustified actions in preventing Patriot from honoring CVII's warrants by, among other things, breaching his back-to-back agreement with Patriot by failing to deliver shares upon CVII's exercises and failing to hold sufficient unencumbered shares to satisfy Patriot's obligations under the warrants.  Compl. (D.E. 1) ¶ 1.  The Complaint's allegations set forth the same facts that formed the basis for Hudson Bay's pending tortious interference claim.  *See* Compl. ¶¶ 1, 6, 17, 83, 93-97, 172-185, 190-202.  This Court has already determined that Mariano's actions were improper, that he interfered with Patriot's honoring of the warrants for his own personal benefit and that the warrant holders suffered damage.  The only remaining question is whether Mariano's tortious conduct was the proximate cause of Patriot's breach.

Despite this Court's recent ruling upholding Hudson Bay's tortious interference claim, Mariano's Motion seeks dismissal of CVII's claim based on the same arguments that were fully

considered and rejected by this Court—"that: (1) he is not a 'third party' to the relevant contracts, [and] (2) his conduct was justified based on his economic interest in Patriot and his status as an officer of the company[.]" *Compare Hudson Bay Master Fund Ltd. v. Patriot Nat'l Inc.* ("*Hudson Bay III*"), No. 16-cv-2767 (GBD), 2019 WL 1649983, at \*12 (S.D.N.Y. Mar. 28, 2019) *with* Mot. at 9-17. There is nothing about CVII's tortious interference claim—which is based on Mariano's exact same actions in relation to the exact same transaction—that warrants a different result here.

### A. Mariano Is A Stranger To The Warrants

Mariano argues (just as he did in the *Hudson Bay* case) that he cannot be held liable for tortious interference because he was not a stranger to the warrants. Mot. at 15-17. This Court has already fully analyzed and correctly rejected that contention. *Hudson Bay III*, 2019 WL 1649983, at \*12-13 & n. 15. As this Court held, "a party to a multilateral agreement can be found liable for tortious interference with the agreement . . . where the alleged tortfeasor has rights and duties that are separate from those of the breaching party." *Id.* at \*12 (quoting *UBS Sec. LLC v. Highland Capital Mgmt., L.P.*, 927 N.Y.S.2d 59, 66 (1st Dep't 2011)). While Mariano was a party to the transaction that led to the issuance of the warrants, "the SPA and REA clearly assign Mariano rights and duties separate from those of Patriot. More importantly, Mariano did not have a duty to deliver shares to [the investors] pursuant to [the investors'] exercise of the New Warrants." *Id.* at \*13. "Because Patriot alone was obligated to deliver shares to [the investors] under the New Warrants, Mariano is a stranger to that portion of the contractual relationship and may be held liable for interfering with those parties' contractual rights." *Id.* (citing *Island Two LLC v. Island One, Inc.*, No. 13-cv-2121 (LGS), 2013 WL 5380216, at \*3-4 (S.D.N.Y. Sept. 26, 2013)).

Mariano seeks to avoid this conclusion with the same ill-fated contention he advanced in the *Hudson Bay* case—that CVII's Complaint alleges that Mariano was Patriot's "alter ego." Mot. at 16-17. CVII has not claimed that Mariano was Patriot's alter ego. Had it done so, it would have

brought a claim for breach of contract against him under that theory. CVII's allegations that Mariano exerted improper influence over Patriot board members to get Patriot to take actions for his benefit are far from alleging that a publicly traded company is the mere alter ego of its controlling shareholder. As this Court previously held, "Mariano may not pierce the corporate veil 'in the reverse manner' for his own benefit.'" *Hudson Bay III*, 2019 WL 1649983, at *13 n. 15 (citing *Island Two LLC*, 2013 WL 5380216, at *2); *see also Machline v. Nat'l Helicopter Corp. of Am.*, No. 94-cv-8456 (LBS), 1997 WL 786937, at *6 (S.D.N.Y. Dec. 22, 1997) ("[A] publicly-traded company with revenues in the millions, a board of directors, officers and all the trappings of a corporation can hardly be treated as the alter ego" of its majority owner).[1]

### B. Mariano Cannot Rely on the Economic Interest Doctrine

As he did in seeking summary judgment against Hudson Bay, Mariano also argues that CVII's tortious interference claim cannot proceed because of the "economic interest" doctrine. Mot. at 9-14. Again, this Court already dispensed with that argument—"the economic interest defense is only properly applied where the defendant takes action to protect the legitimate business interests of *the breaching party* in which the defendant holds an economic stake." *Hudson Bay III*, 2019 WL 1649983, at *16 (emphasis in original); *see also VR Optics, LLC v. Peloton Interactive, Inc.*, No. 16-cv-6392 (JPO), 2017 WL 3600427, at *5 (S.D.N.Y. Aug. 18, 2017) (economic interest doctrine "does not apply, however, where the allegedly interfering parties acted to protect their own interest instead of their interest in the breaching party's business."); *Bausch & Lomb Inc. v. Mimetogen Parm., Inc.*, No. 14-cv-6640 (FPG), 2016 WL 2622013, at *11

---

[1] Mariano's reliance on *UBS Sec. LLC*, 927 N.Y.S.2d 59 and *New Media Holding Co., LLC v. Kagalovsky*, 985 N.Y.S.2d 216, 224 (1st Dep't 2014) is misplaced. Mot. at 16-17. Both of those cases involved privately held entities that either "ignore[d] corporate formalities," "commingle[d] assets," or were "completely dominated and controlled" by the defendants. *UBS Sec. LLC*, 927 N.Y.S.2d at 63; *Kagalovsky*, 985 N.Y.S.2d at 224. That is a far cry from a public company whose stock is traded on the New York Stock Exchange.

(W.D.N.Y. May 5, 2016) (same).  As this Court previously found, and as the Complaint alleges at length (Compl. ¶¶ 46, 72, 84, 174, 193, 198-201), "[b]y failing to unencumber his shares, Mariano was clearly acting to protect [*his*] *own* direct interests, rather than [his] interests in the breaching party."  *Hudson Bay III*, 2019 WL 1649983, at \*17 (citation omitted).  Accordingly, "Mariano cannot rely on the economic interest defense."  *Id*.

Mariano contends that this Court misapplied the law because New York courts, in some circumstances, allow creditors to assert the economic interest doctrine despite not being "aligned" with the breaching party.  *See* Mot. at 12-13 (citing *White Plains Coat & Apron Co., Inc. v. Cintas Corp.*, 8 N.Y.3d 422, 426 (2007) and *Ultramar Energy, Ltd. v. Chase Manhattan Bank, N.A.*, 179 A.D.2d 592, 593 (1st Dep't 1992)).  This authority is irrelevant.  Mariano is not a creditor of Patriot.  Furthermore, the cases only demonstrate that a creditor who exercises its rights against a debtor does not tortiously interfere even if its actions happen to prevent the debtor from fulfilling a contract with a third party.  *See Ultramar Energy, Ltd.*, 179 A.D.2d at 592-93.  This makes eminent sense—a creditor has no obligation to forego remedies so that another party may obtain assets from the debtor; therefore, the creditor enforcing its own rights does not amount to tortious interference at all.  *Id*.; *see also* Mot. at 13 (citing other cases with same results).  Here, Mariano was not acting to enforce his rights against Patriot.  Instead, he was preventing Patriot from fulfilling its contractual obligations to CVII so that Patriot would not enforce its rights against him.  Mariano's attempt to analogize this case to those in which a creditor acted to protect its security interest falls flat.

Finally, even if Mariano's actions could somehow fit within the economic interest doctrine, Mariano still cannot avoid CVII's tortious interference claim because the Complaint alleges that Mariano "acted maliciously, fraudulently, or illegally."  *White Plains Coat and Apron Co. v. Cintas*

*Corp.*, 460 F.3d 281, 286 (2d Cir. 2006). Contrary to Mariano's assertion (Mot. at 10), the Complaint catalogues Mariano's illegal and fraudulent actions, including among many other things, misrepresenting his ownership of unencumbered shares and breaching his obligations under the back-to-back agreement. *See. e.g.*, Compl. ¶¶ 1, 6-9, 70-71, 85-90 & 93-99. Indeed, Mariano's actions in lining his own pockets at Patriot's expense in and of itself is enough to overcome the economic interest doctrine. *See, e.g.*, *Kralic v. Helmsley*, 294 A.D.2d 234, 235 (1st Dep't 2002) (defendant's conduct that "worked to the economic disadvantage" of the breaching party "supports plaintiff's claim that defendant engaged in indefensible, malicious conduct[.]"). As this Court correctly ruled before, the economic interest doctrine offers Mariano no relief.

### C. Mariano Cannot Rely on His Status As An Officer and Director Of Patriot

Finally, as he did in the *Hudson Bay* case, Mariano argues he cannot be liable for tortious interference because he was an officer and director of Patriot. Mot. at 14-15. Again, this Court thoroughly analyzed and properly rejected that argument. As this Court held, an officer or director can avoid liability for tortious interference only "where the defendant is, in fact, 'acting *for* the corporation.'" *Hudson Bay III*, 2019 WL 1649983, at *15 (quoting *Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers of New Jersey*, 894 F. Supp. 2d 288, 338 (S.D.N.Y. 2012)) (emphasis in *Hudson Bay*). By contrast, "[p]ersonal liability can be imposed . . . if it is shown that the defendant acted outside the scope of his employment, by committing an independent tort, or by pursuing a personal, and not corporate, interest." *Id.* (add'l citation omitted). *See also Joan Hansen & Co. v. Everlast World's Boxing Headquarters Corp.*, 744 N.Y.S.2d 384, 390-91 (1st Dep't 2002) (same). "Here, Mariano cannot rely on the corporate officer defense because no reasonable jury could find that he was acting *on behalf of* Patriot by *breaching* his own contract with the company." *Hudson Bay III*, 2019 WL 1649983, at *15 (emphasis in original).

Mariano contends that this is not enough, and that CVII must also plead that Mariano's actions were "performed with malice and calculated to impair [CVII's] business for the defendant's profit." Mot. at 15. Even if that were correct (which it is not), the Complaint here details at length how Mariano acted with malice and with the intent to harm CVII for Mariano's own financial benefit. *See* Compl ¶¶ 1, 9-17, 70-74, 85-99, 173-76, 182, 189-202. Thus, Mariano's officer and director argument is meritless, and CVII's tortious interference claim should stand.

## II. The Complaint States Claims for Fraud and Fraudulent Inducement

In addition to the tortious interference claim, the Complaint asserts claims for fraud and fraudulent inducement against Mariano based on his false and misleading statements in: (a) Patriot's SEC filings, including false reports regarding Patriot's financial performance and outlook; (b) the back-to-back agreements Mariano executed with Patriot as part of the transaction which were also filed with the SEC; and (c) direct communications with CVII during the negotiation of the SPA and REA, including promises he would provide the shares owed to CVII under the warrants and omitting that he did not intend to fulfill his obligation and intended to prevent Patriot from honoring the warrants.[2]

The evidence of Mariano's fraud underlying the transaction is extremely strong. In essence, well after CVII's investment and Patriot's breach of the warrants, CVII learned that all of Patriot's SEC filings (documents CVII was entitled to and did rely on in entering into the transaction) were false and misleading because they misstated and hid material financial information about Patriot's relationship with Mariano's separately owned private company,

---

[2]     The SPA, REA, and back-to-back agreements are included as exhibits to the Declaration of Michael E. Dutko, Jr. filed contemporaneously with the Motion. *See* Dkt. Nos. 15 (Declaration), 15-1 (SPA), 15-2 (REA), 15-3 (back-to-back agreement).

Guarantee Insurance Company, Inc. ("Guarantee"). Compl. ¶¶ 11-15. In particular, while the SEC filings were touting Patriot's revenues and strong financial outlook, and Mariano was signing those documents,[3] Patriot's entire existence was in jeopardy because it was not receiving payments from its largest customer Guarantee, and, as the Florida Office of Insurance Regulation ("FOIR") revealed in November 2017, Guarantee was insolvent and had knowingly filed false financial statements with FOIR. *Id.* ¶¶ 11-15, 51-52, 79, 102-04, 123-35, 141-153. Patriot's SEC filings reported revenues from Guarantee that Patriot never received. *Id.* ¶¶ 13, 142-44, 146, 150. Patriot's financial statements did not include reserves against the substantial accounts receivable due from Guarantee even though Patriot had no reasonable expectation of ever being paid. *Id.* ¶¶ 13, 142-44, 146-47, 149-50. In fact, Patriot affirmatively reported that it was not at risk as a result of the amounts due from Guarantee. *Id.* ¶ 143. All of these statements (and much more information in the SEC filings) was false. *Id.* ¶¶ 11-15, 51-52, 79, 102-04, 123-35, 141-53. Meanwhile, Patriot declared a dividend that would have resulted in a payment to Mariano of over $30 million. *Id.* ¶ 116. When that was blocked by the Delaware Chancery Court, in February 2017, Patriot entered into a contract with Guarantee to extend its exclusivity arrangement for which Patriot paid Guarantee $30 million. *Id.* ¶¶ 118-20. And, as the FOIR also reported in November 2017, Guarantee "systematically transferred funds, totaling $15,743,000" to Mariano and engaged

---

[3]     Patriot filed a number of false and misleading financial reports and statements with the SEC that were signed or authorized by Mariano that pre-date the transaction with CVII, including among others: (1) its January 14, 2015, Registration Statement; (2) its 2014 Form 10-K, dated March 31, 2015, with a SOX certification submitted by Mariano; (3) its May 14, 2015 Form 10-Q, with its first quarter 2015 results, with a SOX certification filed by Mariano; (4) its August 14, 2015, Form 10-Q, with its second quarter 2015 results, with a SOX certification signed by Mariano; (5) its October 15, 2015 Secondary Offering S-1; and (6) its November 12, 2015 Form 10-Q, with its third quarter results, with a SOX certification filed by Mariano. Compl. ¶ 142.

in other "transactions involving parties with known association to Mr. Mariano that have been harmful to Guarantee." *Id.* ¶ 126.

From these newly discovered facts, Mariano's scheme became clear. Mariano had propped up Patriot with false and misleading SEC filings and false projections of future performance to extract as much money for himself as he could before the truth came out, leading to financial ruin for both Guarantee and Patriot. *Id.* ¶¶ 12-16, 127-30. The transaction with CVII and Hudson Bay was part of that scheme—it was designed to and did allow Mariano to pocket $30 million by trading on Patriot's reported financial well-being. *Id.* ¶ 55. Mariano knew that investors would rely on Patriot's SEC filings in deciding whether to make any investment – indeed, the SPA expressly noted that CVII could do so. *Id.* ¶¶ 135-41, 153-54. Mariano knew the SEC filings (most of which he signed) were false and misleading. *Id.* ¶ 153. Mariano intended to deceive CVII and cause it to purchase securities from him so that he could cash out of Patriot stock before the inevitable crash. *Id.* Mariano's fraud did not stop there. Mariano also lied about his ownership of unencumbered Patriot stock in the back-to-back agreements he executed with Patriot as part of the transaction; those agreements were shared with CVII before the deal was signed and were filed with the SEC. *Id.* ¶¶ 92-97, 100-01. Again, Mariano knew CVII would rely on his misrepresentations about his stock ownership in deciding to complete the transaction. *Id.* ¶¶ 3, 6-9, 83, 208, 212-15, 222-24, 228. Mariano also lied to CVII by omitting that he never intended to deliver stock to Patriot upon CVII's exercise of the warrants issued in the deal and intended to prevent Patriot from honoring the warrants. *Id.* ¶¶ 1, 7-9, 70-74, 76-77, 85-90, 97-99. In short, Mariano's scheme was quintessential fraud and resulted in significant harm to CVII. The Complaint provides detailed allegations about all of these fraudulent statements and omissions by Mariano, his actual knowledge that the statements were false and misleading, his intent to deceive

CVII (and all of Patriot's shareholders for that matter), CVII's reasonable reliance on the statements, and that CVII suffered damage as a result.

Mariano challenges CVII's fraud claims primarily by contending that this Court's prior rulings in the related cases should result in dismissal of CVII's claims. Mariano's arguments fail because CVII's fraud claims are nothing like the fraud-based counterclaims Mariano and Patriot asserted and this Court dismissed. This Court's prior rulings do not support dismissal of CVII's claims. Mariano's other myriad arguments are similarly flawed. The Motion should be denied.

### A. CVII's Fraud Claims Are Not Duplicative

The thrust of Mariano's Motion is that his fraud-based counterclaims were dismissed in the prior actions, and therefore CVII's fraud claims should suffer the same fate here, for the same reasons. Mot. at 3-5 ("the Court dismissed Mariano's fraud counterclaim in the Hudson Bay Action. *Id.* To be consistent, CVI's fraud claims deserve the same fate."). In the prior actions, this Court dismissed Mariano's fraud-based counterclaims because they simply rehashed his breach of contract counterclaim in the form of a tort. Mariano's (and Patriot's) counterclaims asserted that the investors breached a non-disclosure agreement ("NDA"), Section 2(j) of the SPA and Section 3(b) of the REA by borrowing Patriot stock before the deal closed and short selling thereafter. Their counterclaims asserted that the same activity—borrowing stock before the deal closed and short selling thereafter—also amounted to fraud because the representations that formed the basis of the contract claims were false and misleading and the investors never intended to comply with those contractual representations. This Court correctly held that Mariano's (and Patriot's) fraud-based claims were merely duplicative of their contract counterclaims and could not proceed. *Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc.* ("*Hudson Bay II*"), 309 F. Supp. 3d 100, 115 (S.D.N.Y. 2018). As this Court explained, Mariano's and Patriot's fraud-based

counterclaims "alleged misrepresentations and omissions . . . expressly addressed by the Transaction Documents. . . . [W]hether the Funds had a duty to disclose that they had borrowed shares, falls within the SPA and REA representations that they had not engaged in any transactions since signing the NDA. Given that, Defendants' fraud claims stem directly from their breach of contract claims, those claims are duplicative and are dismissed." *Id*.

Here, by contrast, CVII has no breach of contract claim against Mariano because Mariano (as contrasted with Patriot) did not make false representations or breach obligations ***he owed to CVII*** in the SPA or other transaction documents.[4] Mariano's representations in the SPA were limited to statements about his ownership of shares due to the investors at the closing of the transaction (not the amount due later under the warrants) and having the authority to enter into the deal. *See e.g.*, SPA § 3(b)(i) ("Legal Capacity"), § 3(b)(ii) ("Title to Stockholder Common Shares" – where "Stockholder Common Shares" is defined as the 2,500,000 shares purchased from Mariano directly); § 3(b)(iii) ("Authority"). CVII does not allege that Mariano breached any of his representations or any contractual obligations he owed to it, so CVII's fraud claims cannot be duplicative of any non-existent breach of contract claim.

Indeed, the Complaint's fraud claims have nothing to do with the limited representations Mariano made to CVII in the SPA or REA. Instead, CVII's fraud-based claims charge Mariano with making false and misleading statements and omissions in SEC filings, in the stock back-to-

---

[4] This Court previously recognized the distinction between obligations owed by Mariano and Patriot: "[T]he SPA and REA clearly assign Mariano rights and duties separate from those of Patriot. Most importantly, Mariano did not have a duty to deliver shares to [the investors] pursuant to [the investors'] exercise of the New Warrants. Although certain transaction documents imposed duties on Mariano individually (or Mariano and Patriot, jointly), the New Warrants clearly imposed the duty to deliver shares on Patriot alone. . . . Mariano and Patriot executed a *separate* Back-to-Back Agreement . . . in order to establish Mariano's duty to provide the shares to Patriot – not [the investors]." *Hudson Bay III*, 2019 WL 1649983, at *13.

back agreements he entered into with Patriot, and in direct communications with CVII where he feigned willingness to deliver his own shares to Patriot when CVII exercised the warrants when he never intended to do so. Compl. ¶¶ 1, 3, 6-13, 51-52, 70-74, 76, 85-90, 93-99, 102-104, 141-52. All of these false and misleading statements and omissions were extraneous to the minimal contractual representations Mariano made to CVII.[5] In fact, Mariano's role as a signatory to the SPA and REA has almost no relevance to CVII's fraud counts except demonstrating Mariano's motive to personally benefit from his lies and knowledge that CVII would rely on the false and misleading SEC filings and other misrepresentations and omissions. Mariano's representations and omissions were material, knowingly false, made to induce investors (including CVII) to rely on them, and CVII justifiably relied on them and suffered injury. *See Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009) (citation omitted); *Netto v. Rastegar*, No. 12-cv-4580 (CM), 2012 WL 4336167, at *4 (S.D.N.Y. Sept. 20, 2012).

Accordingly, CVII's fraud claims are not "a re-styling of contract claims" and involve misrepresentations "extraneous to the contract." *Hudson Bay II*, 309 F. Supp. 3d at 115; *see also Torchlight Loan Servs., LLC v. Column Fin., Inc.*, 11-cv-7426 (RWS), 2012 WL 3065929, at *9 (S.D.N.Y. July 25, 2012); *cf. Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006) ("New York law specifically recognizes causes of action for fraud in the inducement when the misrepresentation is collateral to the contract it induced[.]"). Fraud is the appropriate vehicle to hold Mariano accountable for his lies, and his Motion should be denied.

---

[5]     Mariano's Motion concedes this point. *See* Mot. at 6-7 ("Mariano did not make any representations **to CVI** in the Amended Back-to-Back Agreement; he made them **to Patriot**.").

## B. The Merger and Non-Reliance Clauses Do Not Bar CVII's Fraud Claims

Mariano also suggests that this Court's prior ruling—holding that Mariano could not maintain a claim for breach of the NDA because the NDA was superseded by the SPA—somehow acts to bar CVII's fraud claims here. Mot. at 1-3. Again, Mariano's "good-for-the-goose" argument fails on both the law and the facts. On the law, this Court's ruling was on Mariano's breach of contract counterclaim, not his fraud counts. The Court properly found that the NDA was superseded by the SPA pursuant to the merger clause of the SPA and that Mariano could not therefore maintain a claim for breach of the NDA. *See Hudson Bay III*, 2019 WL 1649983, at *7 (S.D.N.Y. Mar. 28, 2019) (the merger clause "clearly evidences the parties' intent to displace all 'prior oral or written agreements,' including the NDA, with the more nuanced terms of the SPA."). Here, CVII's claims are for fraud, not breach of contract. This Court's ruling is wholly inapplicable.

Furthermore, nothing in the SPA, REA or any other contract CVII executed (including any merger or non-reliance provisions) precludes CVII from maintaining fraud claims based on the false and misleading statements and omissions that are the basis for its claims here. Indeed, in its prior ruling, this Court agreed with Patriot's and Mariano's argument that an "integrated agreement supersedes a prior agreement only to the extent the two contracts cover the same subject matter." *Id*. (citing *Barnum v. Millbrook Care Ltd. P'ship*, 850 F. Supp. 1227, 1236 (S.D.N.Y. 1994) ("It is well established that a subsequent contract regarding the same matter will supersede the prior contract."), *aff'd,* 43 F.3d 1458 (2d Cir. 1994)). As discussed above, the fraud perpetrated by Mariano that is the subject of CVII's claims is not based on representations or warranties Mariano made to CVII in the parties' contracts; thus, the SPA and REA do not "cover the same subject

matter" as Mariano's fraudulent misrepresentations and omissions, and do not bar CVII's fraud claims.

In addition, the language of the SPA's merger clause shows that it is inapplicable to CVII's fraud claims here. The SPA's merger clause states:

> This Agreement, the other Transaction Documents and the schedules and exhibits attached hereto and thereto and the instruments referenced herein and therein **supersede all other prior oral or written agreements** between the Buyers, the Stockholder, [and] the Company . . . and this Agreement, the other Transaction Documents, the schedules and exhibits attached hereto and thereto and the instruments referenced herein and therein contain the entire understanding of the parties solely with respect to the matters covered herein and therein . . .

SPA § 9(e) (emphasis added). The REA's merger clause notes only that the REA supersedes "other prior oral or written agreements among the Buyer, the Company, their affiliates and persons acting on their behalf with respect to the matters discussed herein and therein . . ." REA § 8(f). It does not purport to supersede any prior oral or written agreements (after the SPA but before the REA) between CVII and the Selling Stockholder (*i.e.*, Mariano).

The bases for CVII's fraud claims against Mariano—his false statements and omissions in SEC filings and the back-to-back agreements—are not "prior oral or written agreements" barred by the SPA. The SEC filings are not agreements at all. While the original back-to-back agreement is an agreement between Mariano and Patriot, it was executed contemporaneously with the SPA and is not a "prior agreement." Moreover, the back-to-back agreements are "Transaction Documents," which are defined in the SPA as:

> this Agreement [the SPA], the Common Shares, the Warrants, the Registration Rights Agreement, the Irrevocable Transfer Agent Instructions (as defined below) **and each of the other agreements and instruments entered into or delivered by any of the parties hereto in connection with the transactions contemplated hereby** and thereby, as may be amended from time to time.

SPA § 3(ii) (emphasis added). CVII's claims relating to its discussions with Mariano and his omissions during those discussions (failing to disclose that he never intended to deliver his shares when the warrants were exercised and would compel Patriot to dishonor the warrants) and Mariano's fraud in the amended back-to-back agreement occurred after the SPA and are not addressed by the merger clause of the REA at all. Even if they were, Mariano's statements are not "prior oral or written agreements," but misrepresentations and omissions not addressed in the REA and again therefore outside the plain language of the merger clause.

In yet another attempt to twist this Court's prior rulings in his favor, Mariano also invokes Section 2(e) of the SPA (the "non-reliance clause"), contending that CVII cannot plead reasonable reliance on Mariano's fraudulent statements and omissions. Mot. at 2-3 ("The Court also observed that 'the parties manifested their intent to make the terms of the SPA the exclusive grounds upon which the Funds may be liable for transactions occurring during the SPA's negotiation . . . Using similar reasoning, the Court should find that the SPA contains 'the exclusive grounds upon which [Mariano] may be liable for [misrepresentations] occurring during the SPA's negotiation.'") (quoting *Hudson Bay III*, 2019 WL 1649983, at *7). Again, this argument gets Mariano nowhere.

Section 2(e) of the SPA (updated in the REA) is a representation by CVII that:

> The Buyer has, in connection with the Buyer's decision to purchase Securities, not relied upon any representations or other information (whether oral or written) other than as set forth in the representations and warranties of [Patriot] and [Mariano] contained herein ***and the information disclosed in the SEC Documents*** . . .

SPA § 2(e) (emphasis added); REA § 2(a)(ix). CVII's fraud claim rests in large part on the very SEC Documents that Section 2(e) expressly allowed CVII to rely upon. *See, e.g.*, Compl. ¶¶ 10, 11, 13, 51-52, 142-153. The same is true of Mariano's fraudulent representations in and regarding the back-to-back agreements, which were filed with the SEC and thus are SEC Documents themselves. *See* Compl. ¶ 100. Moreover, the back-to-back agreements are Transaction

Documents and thus within the ambit of CVII's intended reliance. And, Mariano's omissions are not "representations or other information (whether oral or written)" – they are the lack of any "representations" or "information." Accordingly, the non-reliance clause does not preclude CVII's reliance on Mariano's false and misleading statements and omissions underlying its fraud claims.[6]

Finally, even if the SPA did not expressly authorize CVII to rely on the fraudulent misrepresentations and omissions detailed in the Complaint, it still would not negate CVII's reliance on those representations (or Mariano's omissions) as a matter of law. "The law is abundantly clear in [New York] that a buyer's disclaimer of reliance cannot preclude a claim of justifiable reliance on the seller's misrepresentations or omissions unless (1) the disclaimer is made sufficiently specific to the particular type of fact misrepresented or undisclosed; and (2) the alleged misrepresentations or omissions did not concern facts peculiarly within the seller's knowledge." *Basis Yield Alpha Fund (Master) v. Goldman Sachs Grp., Inc.*, 115 A.D.3d 128, 137 (1st Dep't 2014); *see also Kelly v. Jefferies Grp., Inc.*, No. 17-cv-2432 (ALC), 2018 U.S. Dist. LEXIS 26090, at *33 (S.D.N.Y. Feb. 15, 2018) (noting "the demanding standard Defendants face at the motion to dismiss stage where . . . the peculiar knowledge exception is invoked.") Here, the non-reliance disclaimer fails both prongs of this test.

First, the clause does not address any specific representations at all, but rather speaks in general terms about CVII's non-reliance on "any representations or other information." SPA § 2(e). This is not "sufficiently specific to the particular type of fact misrepresented or undisclosed" to bar CVII's fraud claim against Mariano. *Basis Yield Alpha Fund*, 115 A.D.3d at 137. Second,

---

[6] For the same reason, Mariano's reliance on *ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) is misplaced. In *ATSI*, the contract disclaimer stated that "[t]here are no restrictions, promises, warranties, or undertakings, other than those set forth or referred to herein." *Id.* at 95. Here, the contracts expressly allows CVII to rely on exactly the extra-contractual representations that form the basis of its fraud claims.

as alleged in the Complaint, Mariano's fraudulent representations and omissions were "peculiarly within his knowledge." Among other things, there was no way CVII could have known about: (1) the fraudulent information in the SEC filings about Patriot's financial operations and outlook; (2) Mariano's manipulation of the finances of Guarantee, a wholly separate company that deceived its own regulators for years; (3) Mariano's encumbrance of his stock; or (4) Mariano's undisclosed present intent to avoid his obligations under the back-to-back agreements and cause Patriot to dishonor the warrants while assuring CVII (and Patriot's shareholders generally) he would provide the shares called for under the warrants from his personal holdings to avoid shareholder dilution. *See, e.g.*, Compl. ¶¶ 76 (Mariano's intent to breach the back-to-back agreements); 102-113 (Mariano's knowledge of Patriot's financial outlook), 114-130 (Guarantee's financial problems and its effect on Patriot). As courts in this district have noted, "where allegations suggest that a seller intentionally misled a buyer in order to protect its own economic position, courts have been more willing to find that the seller possessed peculiar knowledge of the facts." *LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*, 10 F. Supp. 3d 504, 518 (S.D.N.Y. 2014). That is exactly what is alleged here. *See, e.g.*, Compl. ¶¶ 1 (Mariano induced CVII to enter into the transaction "for Mariano's personal financial benefit"); 46 (Mariano and Patriot initiated the transaction "at Mariano's urging due to his own personal financial needs").[7]

---

[7]     The peculiar knowledge exception applies not only where the facts allegedly misrepresented were within the exclusive knowledge of the defendant, but also where the truth might have been discovered only with "extraordinary effort or great difficulty." *DIMON Inc. v. Folium, Inc.*, 48 F. Supp. 2d 359, 368 (S.D.N.Y. 1999). Thus, situations "where the alleged fraud was hidden in [] accounting records, requiring extraordinary effort and sophisticated consultants to unmask[,]" are uniquely suited to the peculiar knowledge exception. *E*Trade Fin. Corp. v. MarketXT Holdings Corp.*, No. 05-ap-01082, 2006 WL 2864963, at *13 (Bankr. S.D.N.Y. Sep. 29, 2006). Such is the case here, where Mariano operated a financial fraud "hidden" not only in the financial records of Patriot, but of Guarantee as well.

For all of these reasons, the merger and non-reliance clauses present no barrier to CVII's fraud claims against Mariano.

### C. CVII Has Pled Fraud With Sufficient Particularity

Mariano next asserts that CVII failed to satisfy Rule 9(b) because it did not sufficiently alleged "where and when" Mariano's fraudulent statements were made, selectively quoting excerpts from the Complaint for support. Mot. at 5-6. Contrary to Mariano's position, the Complaint provides extensive detail about the fraudulent statements made by Mariano, including the exact dates and documents containing those false statements. *See, e.g.*, Compl. ¶¶ 6, 93-94, 97 (Amended Stock Back-to-Back Agreement); 51-52, 103-04 (November 9, 2015 press release with false financial projections), 142-152 (identifying specific false and misleading SEC filings signed by Mariano); 71-78, 88-90, 93, 97 (identifying discussions between Mariano and CVII representative Martin Kobinger after the closing of the original transaction and leading up to the execution of the REA).

The most Mariano can say is that CVII did not identify the specific dates he lied to Mr. Kobinger and omitted relevant information during their discussions. Mot. at 5 (citing Compl. ¶ 71 and complaining it alleges that "Mariano had several discussions with CVI's Martin Kobinger, but does not allege where and when those discussions occurred."). Mariano ignores—but the Complaint makes clear—that those communications occurred in a one-week time period after the closing of the original deal and before the execution of the REA (December 17 to December 23, 2015). Compl. ¶¶ 71-78, 88-90, 93, 97. This provides Mariano with more than adequate notice of when, where and what he is accused of lying about—nothing more is required. *See Optima Media Grp. Ltd. v. Bloomberg L.P.*, No. 17-cv-1898 (AJN), 2019 WL 1746107, at *3 (S.D.N.Y. Mar. 29, 2019) ("[W]hile specificity is required, a plaintiff need not plead dates, times, and places with

absolute precision, so long as the complaint gives fair and reasonable notice to defendants of the claim and the grounds upon which it is based.").[8]

Finally, even if CVII's extensive allegations of Mariano's affirmative misrepresentations were not enough (which they are), its allegations about Mariano's fraudulent *omissions* are undeniably sufficient. To allege fraudulent omissions with the requisite particularity, a "(1) what the omissions were; (2) the person responsible for the failure to disclose; (3) the context of the omissions and the manner in which they misled the plaintiff, and (4) what defendant obtained through the fraud." *Senior Health Ins. Co. of Pennsylvania v. Beechwood Re Ltd.*, 345 F. Supp. 3d 515, 525 (S.D.N.Y. 2018). Again, the Complaint more than satisfies that standard. *See, e.g.*, Compl. ¶¶ 102 (failure to disclose that Patriot would miss its 2015 financial projections), 134 (failure to disclose Guarantee's fraudulent financials and their effect on Patriot), 145 (failure to disclose Mariano's true reason for taking Patriot public).

In short, Mariano's Rule 9(b) argument rests on mischaracterizations of the Complaint and a misunderstanding of the law. It does not defeat CVII's extensive, well-pleaded claims.

### D. CVII Adequately Alleges Misrepresentations Based on the Back-to-Back Agreements

Mariano next contends that CVII's fraudulent inducement claim fails to the extent it relies on misrepresentations he made to Patriot in the back-to-back agreements because the representations were not made directly to CVII. First, the Complaint clearly alleges that Mariano made the same misrepresentations contained in the amended back-to-back agreement (about his

---

[8]     If the Court finds the complaint deficient under Rule 9(b), CVII can provide much more detail on Mariano's false and misleading statements and omissions and requests leave to amend to do so. CVII did not include more detail because: (1) it believed its allegations were sufficiently particularized; and (2) it did not want to be prolix in detailing all of the false and misleading statements Mariano made.

ownership of a sufficient number of unencumbered shares to satisfy the warrants and willingness and ability to deliver those shares to Patriot) *directly to CVII* during the course of their negotiations on the revised transaction. *See, e.g.*, Compl. ¶¶ 89 ("Mariano **personally** communicated with CVII to renegotiate the deal, knowing that he" did not intend to honor the terms of the revised deal) (emphasis added); 97 ("Mariano nonetheless advised CVII that he would be responsible for delivering the shares underlying the New Warrants . . ."); 208 ("Mariano made false and misleading statements in his negotiations with CVII and in ensuring CVII that he would comply with the terms of the revised transaction and that he had sufficient unencumbered Patriot stock to deliver to CVII . . .").

Second, as Mariano acknowledges, under New York law, a defendant can be liable for a fraudulent representation made to a third party if the plaintiff alleges "he relied to his detriment on the defendant's misrepresentation and that the defendant intended the misrepresentation to be conveyed to him." Mot. at 7 (citing *Sec. Inv'r Prot. Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 71 (2d Cir. 2000)). Mariano contends this doctrine is inapplicable because CVII made no such allegations. That is wrong. Again, the Complaint clearly alleges that CVII relied on the misrepresentations in the back-to-back agreements and that Mariano intended CVII to rely on those misrepresentations. *See, e.g.*, Compl. ¶¶ 6 (noting that Mariano "assured CVII" that he would adhere to the terms of the amended back-to-back agreement); 63 (noting that Patriot disclosed the terms of the initial transaction—including the back-to-back agreement, in a press release and SEC filing); 83-84 (explaining that the back-to-back agreement was an integral part of the overall transaction to avoid dilution of Patriot's existing shareholders, including CVII). Accordingly, CVII has adequately pled fraud based on the back-to-back agreements.

### E.  The Complaint Adequately Alleges Fraud By Omission

Mariano next contends that, to the extent CVII's common-law fraud claim is predicated on Mariano's omissions, it fails because "CVI has failed to allege that Mariano had a duty to disclose" the hidden facts.  Mot. at 7-8.  Once again, Mariano is wrong.  Again, the Complaint specifically alleges that Mariano concealed facts that he had a duty to disclose including, among other things, the precarious nature of Patriot's finances in the lead up to the transaction, the reality of Patriot's relationship with Guarantee, including that Guarantee was on the brink of failure at the time of the transaction, as well as Mariano's intention not to comply with the back-to-back agreement and to prevent Patriot from complying with the warrants when negotiating the REA.  *See, e.g.*, Compl. ¶¶ 110 (alleging that Mariano had "a duty to disclose" the fact that "Patriot would not meet its own 2015 projections"), 134 ("Mariano failed to disclose to CVII information about Guarantee's fraudulent financials and the resulting peril to Patriot's continued existence which he had a duty to disclose when selling stock to CVII.").

Notwithstanding these allegations, Mariano suggests that CVII's Complaint is deficient because it does not identify the specific legal bases for Mariano's duty to disclose the truth to CVII. This is not required in a complaint.  Even if it were, as Mariano acknowledges, a duty to disclose arises "when the defendant 'has made a partial or ambiguous statement'" or "where one party possesses superior knowledge, not readily available to the other, and knows the other is acting on the basis of mistaken knowledge," among other circumstances.  Mot. at 7-8 (quoting *Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*, 244 F.R.D. 204, 213 (S.D.N.Y. 2007)); *see also Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.*, 753 F. Supp. 2d 166, 180 (S.D.N.Y. 2010) ("[O]nce a party chooses to speak, it has a 'duty to be both accurate and complete.'") (citation omitted).  The Complaint clearly alleges both of these bases.  First, the

Complaint details the multiple false and misleading statements contained in the SEC filings and the back-to-back-agreements. Because Mariano chose to speak in these documents, he had a duty to disclose the omitted facts necessary to make the statements not misleading (including information about Patriot's finances, Guarantee's precarious financial status, and Mariano's intent not to deliver his shares to Patriot when CVII exercised the warrants). Second, the Complaint demonstrates that Mariano possessed superior knowledge not readily available to CVII and knew CVII was acting on the basis of misinformation about, among other things, Patriot's financial status, its ability to continue in business in light of the precarious financial position of its largest customer, Guarantee, and Mariano's intention to breach the amended back-to-back agreement and prevent Patriot from performing under the warrants. *See, e.g.*, Compl. ¶¶ 111 ("Mariano failed to disclose to CVII that Patriot would not meet its earnings projections and induced CVII to rely on Patriot's SEC filings, including its November 9, 2015, Form 8-K containing those projections."); 135 ("Mariano in fact induced CVII to rely on Patriot's SEC-filed financial statement which he knew were materially false and misleading because, among other things, they omitted material facts about the fraudulent and unsustainable revenues from Guarantee."). In fact, one of the Complaint's central themes is that Mariano concealed the realities of Patriot's and Guarantee's true financial picture *precisely because* he knew that CVII would never have entered into the transaction had it known the truth. *See* Compl. ¶ 1 (alleging that Mariano made "omissions of material fact . . . to induce CVII to enter into an investment with Patriot and Mariano for Mariano's personal financial benefit."). This type of information is the essence of "superior knowledge" giving rise to a duty to disclose.

Finally, Mariano also had a duty to speak when "trad[ing] on confidential information[.]" *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) (quoting *In re Time Warner*

*Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993)); *see also Delshah Grp. LLC v. Javeri*, No. 09-Civ-6909 (KBF), 2013 WL 2322488, at *17 (S.D.N.Y. May 28, 2013) ("Knowledgeable corporate insiders have a duty to disclose material facts when selling stock to outsiders."). There are therefore multiple bases establishing Mariano's duty to disclose omitted material information when he sold stock to CVII.

Because of CVII's extensive allegations and the controlling law, Mariano's suggestion that the Complaint does not adequately plead the basis for Mariano's duty to disclose omitted facts does not withstand scrutiny.

### F. The Complaint Alleges More Than Mere Puffery

Finally, Mariano half-heartedly argues that CVII's fraud claims based on Patriot's false statements about its "future prospects" and "outlook" should be dismissed because the statements constitute "mere puffery". Mot. at 8-9. Once again, Mariano's position is wrong on the facts and the law. On the facts, while the Complaint generally described Patriot's projections as "rosy," the projections themselves were not simply generic positive statements about the company's future, but specific financial metrics—including revenues, expenses, and net income—that Patriot was projecting it would achieve for 2015. *See* Compl. ¶ 10, 51-52, 102-11 ("on February 24, 2016, Patriot announced its 2015 fiscal year end financial results. As Mariano knew they would, Patriot's results fell below its own projections in almost every category.").[9] The Complaint also alleges that Mariano intentionally induced CVII to rely on the projections that he knew would not be achieved. *See, e.g.*, Compl. ¶¶ 102-113. On the law, that is not puffery—that is fraud. *See, e.g.*,

---

[9]     While the Complaint's allegations make clear that the projections contained specific numbers that Patriot "missed," and identifies the date the projections were published (so Mariano is well aware of what the projections actually state), if the Court believes the Complaint should include the specific numbers and what the actual results were to further support the fraud claims, CVII can certainly do so and respectfully requests leave to amend to add that detail.

*Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994) ("relatively concrete representation[s] as to a company's future performance" are not puffery); *Nivram Corp. v. Harcourt Brace Jovanovich, Inc.*, 840 F. Supp. 243, 252 (S.D.N.Y. 1993) (noting that forward-looking projections are actionable where "other misrepresentations and omissions underlie the forecast in question."); *see also Fresno Cty. Emples. Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 548 (S.D.N.Y. 2017) (future projections were not puffery when they were "designed to mislead investors into believing that [defendant's] present (as well as its future) was rosier than reality."). Accordingly, Mariano's attack on the Complaint should not succeed.

## **CONCLUSION**

For the foregoing reasons, Plaintiff CVII respectfully requests that the Court deny Mariano's Motion to Dismiss the Complaint in its entirety.

Dated: June 27, 2019

**BALLARD SPAHR LLP**

By: /s/ Marjorie Peerce
      Marjorie Peerce
      Joseph Slaughter
      1675 Broadway, 19th Floor
      New York, NY 10019
      Direct Dial: (212) 346-8039
      Fax: (212) 223-1942
      peercem@ballardspahr.com
      slaughterj@ballardspahr.com

      *Attorneys for Defendant CVI Investments, Inc.*

**OF COUNSEL**:
M. Norman Goldberger (*pro hac vice* motion to be filed)
Laura E. Krabill (*pro hac vice* motion to be filed)
goldbergerm@ballardspahr.com
krabilll@ballardspahr.com
Ballard Spahr LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
(215) 864-8850